FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE ____APR 1 1 2013

~Madsen C.O.~

CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on Apr 11, 2013

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| GASTON CORNU-LABAT, | No. 86842-5 |
| Respondent, | |
| v. | En Banc |
| HOSPITAL DISTRICT NO. 2 GRANT COUNTY d/b/a QUINCY VALLEY HOSPITAL, | Filed APR 1 1 2013 |
| Appellant. | |

J.M. JOHNSON, J.—While employed as a physician at Quincy Valley Medical Center (QVMC), Gaston Cornu-Labat was the subject of several complaints that raised doubts as to his competency to practice medicine. QVMC conducted two investigations that ended after the charges against Dr. Cornu-Labat were not substantiated. Nevertheless, QVMC requested that Dr. Cornu-Labat be psychologically evaluated and ended the doctor's employment when he failed to consult the recommended provider.

Dr. Cornu-Labat filed a Public Records Act (PRA) (chapter 42.56 RCW) request asking for records related to the hospital's investigations. QVMC claimed the documents were exempt from disclosure under RCW 4.24.250 (documents prepared for and maintained by a regularly constituted peer review committee), RCW 70.41.200 (documents prepared for and maintained by a regularly constituted quality improvement committee), or RCW 70.44.062 (meetings or proceedings of a public hospital district board or its agents concerning the status of a health care provider's clinical privileges).

The trial court granted summary judgment in favor of Dr. Cornu-Labat, holding none of the PRA exemptions invoked by QVMC applied. The court concluded that the records of a peer review committee that contained nonphysicians could not qualify for the exemption in RCW 4.24.250. This was error. We remand because questions of material fact remain as to whether the records at issue were prepared for a regularly constituted peer review body under RCW 4.24.250. Questions also remain as to whether any records were generated during a confidential meeting of agents of the QVMC board concerning Dr. Cornu-Labat's clinical or staff privileges. We affirm the trial court's conclusion that the exemption for

quality improvement committees, RCW 70.41.200, does not apply under these facts.

FACTS AND PROCEDURAL HISTORY

QVMC is a public hospital district. A public hospital district is a municipal corporation. RCW 70.44.010. As such, QVMC is a "local agency" for purposes of the PRA. RCW 42.56.010(1). The hospital is very small. At the time of the events pertinent to this case, the medical staff consisted of four physicians with voting rights and two nonvoting nurse practitioners. The medical staff is governed by QVMC's bylaws. Article VIII of the bylaws delineates a procedure for corrective or disciplinary action. Corrective action taken under article VIII must be authorized by the medical staff. QVMC also has a disruptive behavior policy under which the hospital administrator or chief of staff can act unilaterally.

Respondent, Gaston Cornu-Labat, was a surgeon employed by QVMC from February 2007 until January 2010. While serving as president of the QVMC medical staff, Dr. Cornu-Labat enlisted a consultant to conduct a hospital improvement project. Dr. Cornu-Labat openly challenged the administration on a number of issues. His relationship with the administration and staff became strained, which he believes led to a series of strange incidents at the hospital and ultimately his dismissal.

3

The first relevant incident occurred on the night of July 23, 2009. Dr. Cornu-Labat was conversing with a nurse who told him she felt uncomfortable with the interaction. Dr. Cornu-Labat left the conversation and self-reported the incident to hospital administrators. The nurse stated she smelled alcohol on Dr. Cornu-Labat and that he seemed aggressive and impatient during their conversation. Dr. Mark Vance, the vice-president of the medical staff, and Mr. Mehdi Merred, the hospital administrator, interviewed four witnesses regarding the matter. Dr. Cornu-Labat was also interviewed. He was informed the interview was being conducted in accordance with article VIII of the hospital's bylaws. The investigators concluded there was insufficient evidence to support the allegation of intoxication.

In August 2009, several other complaints were made to hospital administration regarding Dr. Cornu-Labat's competency to practice medicine and his behavior at work. It was alleged the doctor was uncharacteristically arriving late, rescheduling patients without explanation, having patients wait while he made lengthy phone calls, failing to take patients' vital signs, neglecting his hygiene, and intimidating staff members. The complaints were accompanied by requests that the doctor be suspended immediately.

In response, Dr. Vance and Mr. Merred met with the entire medical staff to determine if an investigation should be conducted. The medical staff authorized an investigation. It was led by Mr. Merred, Dr. Vance, and Mr. Anthony Gonzalez, the board commissioner in charge of personnel. Dr. Cornu-Labat was interviewed on August 4, 2009. Like before, he was informed the interview was conducted in accordance with article VIII of the hospital's bylaws. The complaints were not routed to the hospital's Quality Improvement Committee, a specialized committee that manages the hospital's "Organizational Quality Plan."

QVMC did not uncover enough evidence to substantiate the complaints during its investigation. On August 6, 2009, Dr. Cornu-Labat was presented a letter stating he had been cleared of all charges of unprofessional behavior. Nevertheless hospital administrators "remained concerned" for him. Clerk's Papers (CP) at 88. QVMC placed Dr. Cornu-Labat on paid leave and referred him to the Washington Physician's Health Program (WPHP). QVMC informed Dr. Cornu-Labat it would await a recommendation from WPHP as to his fitness to practice. Dr. Cornu-Labat refused to visit WPHP and instead sought examinations from other psychologists. He was later dismissed from QVMC for his failure to follow QVMC's requests.

Dr. Cornu-Labat filed a PRA request on July 29, 2009, seeking disclosure of records relating to the first investigation. QVMC denied the request, initially claiming that the hospital was not a public agency subject to the PRA or, in the alternative, that the records were "investigative" and exempt under RCW 42.56.240. Dr. Cornu-Labat made a second PRA request for documents relating to both investigations on August 11, 2009. QVMC did not respond. A third request was made on August 26, 2009, and a fourth on January 5, 2010. QVMC responded that the requested records were exempt from disclosure as quality assurance and peer review materials.

On March 8, 2010, Dr. Cornu-Labat filed suit in Grant County Superior Court seeking an order requiring QVMC to disclose the requested records and requesting penalties and attorney fees under RCW 42.56.550(4). Both parties moved for summary judgment. The trial court granted Dr. Cornu-Labat's motion and denied QVMC's motion. It ruled the PRA exemptions cited by QVMC did not apply because the investigations into Dr. Cornu-Labat's conduct were conducted by "*ad hoc* investigative teams which included non-physicians." CP at 375. The court held under RCW 4.24.250, "the peer review committee must be regularly constituted and must consist only of the professional peers of the member being reviewed." *Id.* After QVMC's motion for reconsideration was denied, QVMC appealed.

The Court of Appeals, Division Three, certified the case to this court pursuant to RCW 2.06.030 and RAP 4.4. This court accepted review.

ANALYSIS

Public agency actions challenged under the PRA are reviewed de novo. RCW 42.56.550(3). An appellate court stands in the same position as the trial court when the record consists entirely of documentary evidence and affidavits. *Spokane Police Guild v. Wash. State Liquor Control Bd.*, 112 Wn.2d 30, 35-36, 769 P.2d 283 (1989). The reviewing court is not bound by the trial court's factual findings. *Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 125 Wn.2d 243, 253, 884 P.2d 592 (1994) (*PAWS*). But, where a case was decided as a matter of summary judgment below, it may be appropriate to remand for resolution of a factual question. *Id.*

The PRA is a "strongly worded mandate for broad disclosure of public records." *Hearst Corp. v. Hoppe,* 90 Wn.2d 123, 127, 580 P.2d 246 (1978). It "requires all state and local agencies to disclose any public record upon request, unless the record falls within certain very specific exemptions." *PAWS*, 125 Wn.2d at 250. QVMC contends the privileges it invokes should be liberally construed because there is no underlying litigation demanding broad discovery. Appellant's Opening Br. at 18-19. But the PRA explicitly declares its disclosure provisions "shall be liberally

construed and its exemptions narrowly construed." RCW 42.56.030. Thus, QVMC's assertion is untenable. The requested documents are exempt from disclosure only if they fall under one of the specific, narrowly construed exemptions.

## A. RCW 4.24.250

Hospital internal review mechanisms are critical to maintaining quality health care. *See* RCW 7.71.010; *see also Coburn v. Seda,* 101 Wn.2d 270, 275, 677 P.2d 173 (1984) ("'Candid and conscientious evaluation of clinical practices is a *sine qua non* of adequate hospital care.'" (quoting *Bredice v. Doctors Hosp., Inc.,* 50 F.R.D. 249, 250 (D.D.C. 1970) *aff'd,* 156 U.S. App. D.C. 199, 479 F.2d 920 (1973))). "[E]xternal access to committee investigations stifles candor and inhibits constructive criticism thought necessary to effective quality review." *Anderson v. Breda,* 103 Wn.2d 901, 905, 700 P.2d 737 (1985). Acknowledging this, the legislature created a PRA exemption for "[i]nformation and documents created specifically for, and collected and maintained . . . by a peer review committee under RCW 4.24.250 . . . ." RCW 42.56.360(1)(c). Incorporated into the PRA by reference, RCW 4.24.250 provides:

> (1) Any health care provider as defined in RCW 7.70.020(1) and (2) who, in good faith, files charges or presents evidence against another member of their profession based on the

claimed incompetency or gross misconduct of such person before a regularly constituted review committee or board of a professional society or hospital whose duty it is to evaluate the competency and qualifications of members of the profession, including limiting the extent of practice of such person in a hospital or similar institution, or before a regularly constituted committee or board of a hospital whose duty it is to review and evaluate the quality of patient care and any person or entity who, in good faith, shares any information or documents with one or more other committees, boards, or programs under subsection (2) of this section, shall be immune from civil action for damages arising out of such activities. . . . *The proceedings, reports, and written records of such committees or boards, or of a member, employee, staff person, or investigator of such a committee or board, are not subject to review or disclosure,* or subpoena or discovery proceedings in any civil action, except actions arising out of the recommendations of such committees or boards involving the restriction or revocation of the clinical or staff privileges of a health care provider as defined in RCW 7.70.020(1) and (2).

(Emphasis added.)

In this case, the trial court concluded the records requested by Dr. Cornu-Labat did not fall within the RCW 4.24.250 exemption because nonphysicians were involved in the investigation. The court supported this conclusion by pointing to the part of RCW 4.24.250(1) providing immunity to those who bring charges against "another member of their profession." This language does not support the trial court's conclusion, however. The statute is plain in extending the exemption for written records to *"a member, employee, staff person, or investigator"* of the committee. *Id.* (emphasis

9

added).    The trial court's reading makes this portion of the statute superfluous.  We interpret statutes to give effect to all the language used so that no portion is rendered meaningless or unnecessary.  *State v. J.P.,* 149 Wn.2d 444, 450, 69 P.3d 318 (2003).  The trial court's interpretation is erroneous.

In interpreting a statute, our primary objective is to ascertain and give effect to the intent of the legislature.  *State v. Watson,* 146 Wn.2d 947, 954, 51 P.3d 66 (2002).  "In order to determine legislative intent, we begin with the statute's plain language and ordinary meaning."  *Nat'l Elec. Contractors Ass'n v. Riveland,* 138 Wn.2d 9, 19, 978 P.2d 481 (1999).  RCW 4.24.250 itself does not contain the language "*peer* review committee."  While RCW 42.56.360(1)(c) references RCW 4.24.250 as involving a "peer review committee," what constitutes a peer review committee is not defined in RCW 42.56.360.  Where the legislature has not defined a term, "this court will give the term its plain and ordinary meaning ascertained from a standard dictionary."  *Watson,* 146 Wn.2d at 954.  In "peer review committee," the word "peer" is used as an adjective that describes a particular kind of review committee.  In the dictionary, the adjective "peer" is defined as "belonging to the same group in society."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1665 (2002).  This definition is not particularly instructive.  A

10

"group in society" could be comprised of physicians alone or different types of health care providers.

If, after looking to the dictionary, the meaning of a term is still unclear, its meaning may be gleaned from "related statutes which disclose legislative intent about the provision in question." *Dep't of Ecology v. Campbell & Gwinn, LLC,* 146 Wn.2d 1, 11, 43 P.3d 4 (2002). The only statute to define "peer review" is contained in chapter 7.71 RCW (Health Care Peer Review). RCW 7.71.030(1) defines a "peer review body of health care providers" by reference to RCW 7.70.020. The referenced provision defines "'health care provider'" to include "a hospital, clinic, health maintenance organization, or nursing home; *or an officer, director, employee, or agent thereof* acting in the course and scope of his or her employment." RCW 7.70.020(3) (emphasis added). Thus, Mr. Merred, as an officer of the hospital, and Mr. Gonzalez, as one of its directors, could contribute to a "peer review body of health care providers."

This interpretation is in alignment with a majority of jurisdictions that do not require a peer review committee to be limited to physicians. *See, e.g., Driscoll v. Stucker,* 893 So. 2d 32, 45 (La. 2005) ("'Peer review' is the process by which physicians, *hospitals and other health care providers* review the performance of other physicians and, when warranted, discipline

the reviewed physician." (emphasis added)); *State ex rel. Charles Town Gen. Hosp. v. Sanders,* 210 W. Va. 118, 125 n.6, 556 S.E.2d 85 (2001) (defining peer review as "'the procedure for evaluation by health care professionals of the quality and efficiency of services ordered or performed by other health care professionals . . .'" (quoting W. Va. Code § 30-3C-1 (1975))); *Brownwood Reg'l Hosp. v. Eleventh Court of Appeals,* 927 S.W.2d 24 (Tex. 1996) (holding the minutes of a board of trustees' meeting were protected by peer review privilege even though the board contained nonphysician members). In addition, many hospitals in this state have a peer review process that includes nonphysicians. CP at 404-98. The trial court's interpretation of RCW 4.24.250 would not cover the peer review activities of many Washington hospitals, frustrating the legislature's intent.

Dr. Cornu-Labat also argues the documents do not fall under RCW 4.24.250 because the group involved in the investigation was not "a regularly constituted review committee." We have held a "showing of an informal investigation is not sufficient under RCW 4.24.250." *Adcox v. Children's Orthopedic Hosp. & Med. Ctr.,* 123 Wn.2d 15, 31, 864 P.2d 921 (1993). Instead, RCW 4.24.250 is applicable "only if the committee in question is 'a regularly constituted committee or board of [the] hospital whose duty it is to review and evaluate the quality of patient care.'"

12

*Coburn*, 101 Wn.2d at 277 (alteration in original) (quoting former RCW 4.24.250 (1981)).

Regarding QVMC's first investigation, Dr. Cornu-Labat argues "Merred formed the 'committee' the morning after Dr. Cornu-Labat self-reported the incident with a QVMC nurse . . . . The 'investigation' lasted for one day only." Br. of Resp't at 17. According to Dr. Cornu-Labat, Anthony Gonzalez joined the second investigation because he was a state patrol officer with an investigatory background, not because he was a QVMC board member. *Id.* at 18. Dr. Cornu-Labat also posits the investigation was conducted under the "disruptive behavior policy" rather than article VIII of the bylaws. He says this policy "does not call for review by a regularly constituted committee" but "authorizes a hospital administrator and the chief of staff to investigate" an allegation. *Id.* at 27. It is evident article VIII was not followed, Dr. Cornu-Labat argues, because he was not given an opportunity to respond to the charges before the entire medical staff, as provided in article VIII's corrective action procedure.

In contrast, QVMC maintains the investigation was conducted under article VIII of its bylaws. Because QVMC is a small district hospital, it does not have a specific executive or credentialing committee. Instead, the entirety of the medical staff performs the functions that a committee of this

sort would perform at a larger hospital. The medical staff meets on a regular basis. One of the duties of the medical staff under the QVMC bylaws is to evaluate the competency and qualifications of medical staff members. According to QVMC, the Cornu-Labat investigations were authorized by the medical staff, and Dr. Vance, Mr. Merred, and Mr. Gonzalez were acting as *agents* of this regularly constituted body. In *Breda,* we emphasized that the privilege in RCW 4.24.250 extends to "the records of committee *members and agents.*" 103 Wn.2d at 904-05 (emphasis added).

Issues of material fact remain regarding whether the QVMC officials that investigated Dr. Cornu-Labat were acting as agents of a regularly constituted committee (the medical staff) under RCW 4.24.250 or as an ad hoc investigative team. Questions also exist as to what review mechanism the hospital utilized in investigating Dr. Cornu-Labat—the disruptive behavior policy, which does not require participation of a regularly constituted committee, or article VIII, which does. While exact compliance with either policy is not pertinent to this case, the policy purportedly followed will be illustrative of whether a regularly constituted committee was involved. Furthermore, it is possible the first investigation did not meet the requirements of RCW 4.24.250, but the second did.

As material facts are in dispute, this issue was inappropriately decided by summary judgment. The trial court made insufficient findings of fact regarding the applicability of RCW 4.24.250 to the review procedure utilized by QVMC because the court's ruling hinged on the fact that the committee included nonphysicians. We remand for determination of whether a regularly constituted peer review committee was involved in the Cornu-Labat investigation but note that this committee may include nonphysicians. The trial court should consider the hospital's bylaws and internal regulations in making this determination. *See Coburn,* 101 Wn.2d at 278. If there is sufficient evidence Dr. Vance, Mr. Merred, and Mr. Gonzalez were acting as agents of "a regularly constituted review committee or board of a . . . hospital whose duty it is to evaluate the competency and qualifications of members of the profession," then the records created specifically for, and collected and maintained by that committee, are exempt. RCW 4.24.250(1).

B.  RCW 70.41.200

The PRA also exempts "[i]nformation and documents created specifically for, and collected and maintained by a quality improvement committee under . . . RCW 70.41.200." RCW 42.56.360(1) (c). RCW 70.41.200(1) mandates that hospitals maintain a quality improvement

15

program dedicated to improving the quality of health care and preventing malpractice. A "quality improvement committee with the responsibility to review the services rendered in the hospital" is required as part of this program. RCW 70.41.200(1)(a). This committee is vested with the responsibility to "oversee and coordinate the quality improvement and medical malpractice prevention program" and to "ensure that information gathered pursuant to the program is used to review and to revise hospital policies and procedures." *Id.*

The trial court interpreted QVMC's position as conceding that the RCW 70.41.200 exemption does not apply. CP at 374. Dr. Cornu-Labat was apparently under the same perception. Br. of Resp't at 34. QVMC contends its position was misinterpreted: QVMC acknowledges the quality improvement committee, convened under the hospital's "Organizational Quality Plan," was not involved in the investigation. CP at 272. Its view is that a hospital may have multiple quality improvement committees that qualify for the exemption. In this case, QVMC claims the medical staff acted as a quality improvement committee under RCW 70.41.200.

Given that exemptions to the PRA are construed narrowly, it makes little sense to extend the quality improvement privilege to every hospital group that conducts activities vaguely related to improving the quality of

16

medical care. Such broad parameters could conceivably extend to every hospital committee. As RCW 42.56.360(1)(c) specifically references RCW 70.41.200, the PRA exemption applies only to the records of quality improvement committees aimed at bringing a hospital into compliance with the statutory requirements of RCW 70.41.200. In other words, the exemption applies to the work product of committees that "oversee and coordinate the quality improvement and medical malpractice prevention program." RCW 70.41.200(1)(a). While QVMC is correct that there may be more than one committee with these responsibilities, QVMC does not show that its medical staff regularly dealt with the type of quality improvement duties delineated in RCW 70.41.200(1)(a). Here, QVMC had a specific quality improvement committee for purposes of RCW 70.41.200 (under QVMC's "Organizational Quality Plan"), but that committee was not involved in the investigations at issue. CP at 31, 253-61. The exemption does not apply.

C.    RCW 70.44.062

As a public hospital district, QVMC is authorized and governed by chapter 70.44 RCW. Under this chapter, RCW 70.44.062(1) provides:

> All meetings, proceedings, and deliberations of the board of commissioners, its staff or agents, concerning the granting, denial, revocation, restriction, or other consideration of the

17

status of the clinical or staff privileges of a physician or other health care provider as that term is defined in RCW 7.70.020, if such other providers at the discretion of the district's commissioners are considered for such privileges, shall be confidential and may be conducted in executive session: PROVIDED, That the final action of the board as to the denial, revocation, or restriction of clinical or staff privileges of a physician or other health care provider as defined in RCW 7.70.020 shall be done in public session.

QVMC asserts the privilege recited in RCW 70.44.062 is incorporated into the PRA through the PRA's "other statutes" exemption. The PRA mandates disclosure of all public records "unless the record falls within the specific exemptions of . . . this chapter, *or other statute* which exempts or prohibits disclosure of specific information or records." RCW 42.56.070(1) (emphasis added).

Dr. Cornu-Labat adopts the position that RCW 70.44.062 cannot possibly provide an exemption to the PRA because RCW 70.44.062 only protects the confidentiality of "meetings, proceedings, and deliberations," not writings. In *Brouillet v. Cowles Publishing Co.,* we held records identifying the reasons that teachers' certificates had been revoked were not exempt from disclosure under a statute that provided teachers with the right to request a closed hearing. 114 Wn.2d 788, 800, 791 P.2d 526 (1990) (citing RCW 28A.58.455(2) (recodified by LAWS OF 1990, ch. 33, § 4, current version at RCW 28A.405.310)). We stated, "The closed hearing

18

provision does not specifically exempt anything from disclosure. The language of the [PRA] does not authorize us to imply exemptions but only allows specific exemptions to stand." *Id.*

Whether RCW 70.44.062 provides a PRA exemption for public hospital districts is an issue of first impression. Again, in interpreting a statute, our starting point is the statute's plain language and ordinary meaning. *J.P.,* 149 Wn.2d at 450. Unlike the statute at issue in *Brouillet,* the language of RCW 70.44.062 does more than provide the right to request a closed meeting. It declares the "meetings, *proceedings,* and deliberations" of the hospital board regarding a physician's privileges *"shall* be confidential." RCW 70.44.062(1) (emphasis added). The dictionary definition of "proceedings"—a word that was not present in the statute interpreted in *Brouillet*—is "an official record or account (as in a book of minutes) of things said or done." WEBSTER'S, *supra,* at 1807. Accordingly, RCW 70.44.062 refers not only to meetings, but the written records of such meetings. Furthermore, the statute's declaration that "meetings, proceedings, and deliberations . . . *shall* be confidential" (emphasis added) provides a specific—not implied—PRA exemption. It would make little sense for the legislature to demand the unqualified confidentiality of these meetings but not the written accounts of what occurred therein. In

19

conducting a plain meaning analysis, we take care to avoid such "unlikely, absurd or strained consequences." *State v. Sullivan,* 143 Wn.2d 162, 175, 19 P.3d 1012 (2001).

A specific exemption for public hospital district board meetings is logical in context. Public hospital districts operate a minority of the hospitals in this state—mostly small, rural hospitals. In contrast, most of Washington's hospitals are private entities and, as such, are not subject to the PRA. Thus, the confidentiality provision in RCW 70.44.062(1) grants public hospital districts a privilege already held by more than half the hospitals in this state.

The next question is whether any of the records withheld by QVMC constitute "proceedings . . . of the board of commissioners, its staff or agents." RCW 70.44.062(1). While there is no evidence the board of commissioners itself convened to address Dr. Cornu-Labat's situation, QVMC claims the individuals involved in the investigation were all "staff or agents" of the board: QVMC's bylaws state that the hospital administrator (Mr. Merred) is "appointed by the Board to act in its behalf" and that the medical staff is hired by the board and subject to its ultimate authority. *See* CP at 134-35. A member of the board, Mr. Gonzalez, was active in the

second investigation. Dr. Cornu-Labat was informed that Mr. Gonzalez was representing the board of commissioners in the investigation. CP at 192.

QVMC appears to seek a blanket exemption for all documents related to the Cornu-Labat investigation because the investigation was conducted by "staff or agents" of the board. But, RCW 70.44.062(1) speaks to formal meetings and proceedings of the board or its agents, not casual discussions among those subject to the board's direction. This is clear in the language used. RCW 70.44.062(1) allows for the confidential meeting to be "conducted in executive session." "Executive session" is a "meeting, usu[ally] held in secret, that only the members and invited nonmembers may attend." BLACK'S LAW DICTIONARY 1495 (9th ed. 2009). This secret meeting is in contrast to the usual "public session" required by Washington's Open Public Meetings Act, chapter 42.30 RCW. Furthermore, as noted above, the word "proceedings" refers to "an *official* record or account" of a meeting. WEBSTER'S, *supra,* at 1807 (emphasis added). This language indicates the statute does not contemplate the confidentiality of anything less than a formal meeting of the board, its staff or agents, and the PRA exemption protects only the official account of such a meeting.

Because the trial court did not address RCW 70.44.062(1) in its letter opinion, factual issues remain. It is unclear if any of the withheld records

embody a formal meeting of the board's staff or agents concerning the status of Dr. Cornu-Labat's clinical privileges. Rather, it appears a number of the withheld records were generated during the general investigation into Dr. Cornu-Labat's alleged misconduct. While the investigation may have ultimately led to the redaction of Dr. Cornu-Labat's privileges, not every record generated during the investigation will qualify for the exemption in RCW 70.44.062(1). Upon remand, only the minutes of a formal meeting of the board's staff or agents that concerned the status of Dr. Cornu-Labat's clinical privileges may be withheld under RCW 70.44.062(1).

D.    Employment Contract

QVMC next asserts that Dr. Cornu-Labat is bound by his employment contract, under which he agreed that hospital records involving members of the medical staff would remain confidential. The argument that Dr. Cornu-Labat should be treated differently because he was under contract with the hospital and not a mere member of the public cannot be sustained under the PRA. The trial court correctly noted that "it is not Gaston Cornu-Labat the QVMC employee who makes the request for public records. Rather, it is Gaston Cornu-Labat the citizen who makes it." CP at 375. Dr. Cornu-Labat's identity is irrelevant because the PRA states that agencies may not inquire into the identity of the requestor or the reason for the request. RCW

22

42.56.080. Additionally, the provisions of the hospital's employment contract cannot override the PRA. *Brouillet*, 114 Wn.2d at 794 (an agency "is without the authority to determine the scope of exemptions under the act" (citing *Hearst Corp.*, 90 Wn.2d at 129)); *Spokane Police Guild*, 112 Wn.2d at 40 ("'promises cannot override the requirements of the disclosure law'" (quoting *Hearst Corp*, 90 Wn.2d at 137)).

E.      Costs and Attorney Fees

The trial court found QVMC generally responded to Dr. Cornu-Labat's PRA requests honestly and in good faith. It awarded a penalty of $10 per day from August 1, 2009, through the entry of judgment. The trial court also noted that Dr. Cornu-Labat is entitled to attorney fees and costs related to any improperly withheld records. On appeal, Dr. Cornu-Labat requests costs and fees pursuant to RCW 42.56.550(4), as well as the maximum statutory penalty of $100 per day.

Upon remand, Dr. Cornu-Labat is entitled to costs and reasonable attorney fees to the extent he prevails on his PRA claims. *See Limstrom v. Ladenburg*, 136 Wn.2d 595, 616, 963 P.2d 869 (1998) ("If the trial court determines that attorney fees are appropriate, the award should relate only to that which is disclosed and not to any portion of the requested documents found to be exempt."); *see also Sanders v. State*, 169 Wn.2d 827, 865, 240

P.3d 120 (2010). This amount will depend on the trial court's determination of whether certain records are exempt under either RCW 4.24.250 or RCW 70.44.062. If Dr. Cornu-Labat does prevail as to certain records, daily sanctions on the low end of the scale are appropriate based on the trial court's previous finding of good faith on the part of QVMC. *See Yousoufian v. Office of Ron Sims,* 152 Wn.2d 421, 433, 98 P.3d 463 (2004).

CONCLUSION

We remand for determination of whether the group investigating Dr. Cornu-Labat constituted a "regularly constituted committee" or the agents of such a committee under RCW 4.24.250(1). In addition, the trial court should decipher if any of the withheld records constitute proceedings of the board of a public hospital district or its staff or agents concerning the status of a physician's clinical privileges under RCW 70.44.062. The RCW 70.41.200 exemption for the records of a quality improvement committee does not apply here. Attorney fees, costs, and penalties are available to the extent the trial court finds any of the withheld records are not exempt from disclosure.[1]

---

[1] If the trial court determines that attorney fees and costs are appropriate, the award should relate only to the records disclosed and not to any of the documents found to be exempt. *See Sanders,* 169 Wn.2d at 865.

24

WE CONCUR:

Madsen, C.J.

Stephens, J.

Faihurst, J.

Chambers, J.P.T.

Wiggins, J.

Gonzalez, J.