IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| GASTON CORNU-LABAT, | ) | |
| | ) | No. 32436-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HOSPITAL DIST. #2 GRANT COUNTY | ) | UNPUBLISHED OPINION |
| d/b/a QUINCY VALLEY HOSPITAL, | ) | |
| | ) | |
| Petitioners. | ) | |

FEARING, J. — Gaston Cornu-Labat sues Hospital District #2 of Grant County,

d/b/a Quincy Valley Medical Center (QVMC), for alleged violations of Washington's

Public Records Act (PRA) ch. 42.56 RCW. QVMC formerly employed Cornu-Labat as a

surgeon and medical director. As a public hospital district, QVMC is subject to the PRA.

The Washington Supreme Court previously heard an appeal in this case and ruled

there to be issues of fact with regard to exemptions claimed by QVMC under the PRA.

On remand, QVMC refiled a summary judgment motion, with a new declaration from its

hospital administrator, asking for dismissal of Cornu-Labat's claims. The trial court

denied the motion. We granted discretionary review. We now affirm the denial of the

summary judgment motion based on the doctrine of the law of the case. We do not address the merits of the appeal, but remand for trial.

## FACTS

From February 2007 to January 2010, QVMC employed Dr. Gaston Cornu-Labat as a surgeon, chief of medical staff, and, for a brief period, interim Chief Executive Officer (CEO). QVMC is a public hospital district. As such, QVMC is managed by an elected Board of Commissioners (the Board), which has "overall responsibility for the conduct of the hospital." Clerk's Papers (CP) at 135. The Board appoints a CEO "to act in its behalf in the overall management of the hospital." CP at 135. QVMC also has a medical staff with voting rights on subjects such as clinical privileges, practitioner performance evaluations, hospital policymaking, and policy enforcement. The hospital is small. At the time of the pertinent events in this case, the medical staff consisted of four physicians with voting rights and two nonvoting nurse practitioners.

The QVMC bylaws governs the hospital's medical staff. Article VIII of the bylaws delineates the procedure for corrective or disciplinary action against QVMC practitioners accused of substandard conduct. Article VIII generally addresses concerns related to a medical staff member's competence, capacity, or character. QVMC maintains a separate policy titled "Dealing with Disruptive Behavior Among Healthcare Providers" (disruptive behavior policy) for addressing "egregiously disruptive behavior" and "disruptive behavior." CP at 273, 190.

2

On July 23, 2009, Gaston Cornu-Labat worked a night shift at QVMC. During the shift, Cornu-Labat conversed with a nurse who told him, as they spoke, that she felt uncomfortable with the interaction. The nurse complained to Cornu-Labat that he smelled of alcohol and he acted aggressive and impatient. Cornu-Labat ended the conversation and immediately reported the incident to hospital administrators. He requested an investigation.

On July 24, 2009, Dr. Mark Vance, vice-president of the medical staff, and Medhi Merred, hospital administrator, started an investigation of Gaston Cornu-Labat's July 23 conduct. Vance served as acting president for the investigation since Cornu-Labat was president of the medical staff at the time. On July 24, Vance and Merred, along with Glenda Bishop, QVMC's risk management director, interviewed Cornu-Labat and four other persons with knowledge of the intoxication allegations. At the beginning of Cornu-Labat's interview, Merred declared:

> This interview is conducted as part of an investigation conducted in accordance with the Medical Staff Bylaws, Article VIII, and the Administrative Policy "Dealing with Disruptive Behavior Among Healthcare Providers." We are the team investigating the complaint. As the Administrator it is my role to conduct any necessary fact finding.

CP at 190. After completing the inquiry, the investigators concluded insufficient evidence supported the allegation of intoxication. Cornu-Labat received a letter confirming that the intoxication investigation had been dismissed.

While conducting the intoxication investigation, Mark Vance and Mehdi Merred

3

received other complaints from QVMC staff members regarding Gaston Cornu-Labat. The complaints alleged Cornu-Labat arrived late to work, repeatedly rescheduled patients without any explanation, demanded patients wait while he engaged in lengthy telephone calls, convened last minute unscheduled staff meetings, failed to take patient vital signs, neglected his personal appearance, yelled, and intimidated hospital staff.

On July 27, 2009, QVMC's medical staff met and unanimously agreed to investigate the new complaints about Gaston Cornu-Labat pursuant to both Article VIII of the bylaws and the disruptive behavior policy. The staff authorized Mark Vance, Mehdi Merred, and board member Anthony Gonzalez to undertake an investigation into alleged inappropriate and unprofessional behavior of Cornu-Labat.

On July 29, 2009, Gaston Cornu-Labat filed his first public records request with QVMC. He sought: "Any and all records relating to [the intoxication] investigation under the medical staff by laws [sic] for eleged [sic] physician disruptive behavior and/or any other investigation relating to my conduct and my person[.]" CP at 36-37. On the same day, Mehdi Merred, via e-mail, rejected Cornu-Labat's public records request. Merred cited "RCW 42.56.240 which provides exemption from public inspection for specific investigative records compiled by agencies vested with the responsibility to discipline members of any profession." CP at 39. Merred did not identify which documents QVMC refused to produce under the exemption.

4

On August 4, 2009, Mark Vance, Mehdi Merred, and Anthony Gonzalez interviewed Gaston Cornu-Labat. Merred informed Cornu-Labat that the medical staff approved the second investigation pursuant to Article VIII of the bylaws and the disruptive behavior policy. The trio later also interviewed the complainants against Cornu-Labat.

On August 6, 2009, the QVMC investigation panel concluded its second inquiry and cleared Gaston Cornu-Labat of all charges of "inappropriate and unprofessional behavior." CP at 88. Nevertheless, in a letter to Cornu-Labat confirming dismissal of the allegations, QVMC expressed concern for Cornu-Labat and placed him on paid medical leave beginning on August 10, 2009. QVMC directed Cornu-Labat to schedule an "informal interview" with a doctor from the Washington Physicians Help Program (WPHP). The letter informed Cornu-Labat that he could not return from paid leave until WPHP notified QVMC that he was fit for duty. Cornu-Labat challenged the objectivity of WPHP physicians and objected to the conditions of any evaluation by the organization. He refused to undergo an evaluation by WPHP. Cornu-Labat instead submitted independent psychiatric evaluations with providers of his own choosing.

On August 11, 2009, Gaston Cornu-Labat delivered his second public records request to QVMC. He demanded a copy of "all writings relating to any inquiries and/or investigations involving" himself. CP at 115. QVMC sent no written response to this second request.

5

On August 26, 2009, Cornu-Labat's lawyer sent a letter to QVMC and demanded production of the documents sought by Cornu-Labat in his two records request. The attorney argued the inapplicability of the law enforcement investigation exemption. In the lawyer's letter, Cornu-Labat offered to forgo litigation in exchange for prompt disclosure of the requested documents. In response to the letter, QVMC provided some documents, but none related to the investigations.

On October 29, 2009, QVMC terminated Gaston Cornu-Labat's employment. QVMC alerted the local media that Cornu-Labat had been released from employment because of his refusal to submit to an evaluation requested by the hospital.

On January 5, 2010, Gaston Cornu-Labat submitted his third and final public records request. The request demanded copies of nine categories of records relating to QVMC's investigation of him and internal policies of the hospital. On January 20, 2010, QVMC responded by refusing to disclose any records because the requested records were "health care information . . . exempt from disclosure." CP at 700. QVMC cited no statute or case law to support its assertion of a health care information exemption.

## PROCEDURE

On March 10, 2010, Gaston Cornu-Labat brought action against QVMC under the PRA. A long procedural history followed and the history continues to extend. In this suit, Cornu-Labat seeks an order requiring disclosure of the records and awarding penalties and attorney fees under RCW 42.56.550(4). In response, QVMC asserts three

6

possible statutory exemptions: RCW 4.24.250, RCW 70.41.200, and RCW 70.44.062.
RCW 4.24.250 shields from review and disclosure records of a hospital's regularly
constituted review committee engaged in evaluations of the competency and
qualifications of a health care provider. RCW 70.41.200 requires that hospitals maintain
a "coordinated quality improvement program" to improve the quality of health care and
identify and prevent malpractice. RCW 70.44.062 blankets with confidentiality
meetings, proceedings, and deliberations of a public hospital district's board of
commissioners, its staff, or agents concerning the granting, denial, revocation, or
restriction of the clinical or staff privileges of a physician.

Both parties moved for summary judgment. On September 7, 2010, the trial court
granted Gaston Cornu-Labat's motion for summary judgment and denied QVMC's
motion. In so ruling, the trial court analyzed whether the documents sought by Cornu-
Labat were, as argued by QVMC, exempt from disclosure. The trial court determined
that RCW 70.41.200 did not apply because, in part, QVMC conceded in its pleadings that
it had not employed its "quality improvement committee" in its investigations of Gaston
Cornu-Labat.

QVMC moved for reconsideration, and in a September 30, 2010 ruling, the trial
court pronounced that QVMC could not claim an exemption under RCW 4.24.250
because the committees that investigated Gaston Cornu-Labat's conduct were ad hoc,
rather than regularly constituted review committees. The trial court reasoned, in part, that

7

only peers could serve on a regularly constituted review committee, and, since nonphysicians served on the committees, RCW 4.24.250 did not afford an exemption to QVMC. Finally, the trial court ruled that RCW 70.44.062 did not apply because the statute created an exception to the Open Public Meetings Act, not the Public Records Act.

QVMC appealed the trial court's September 7, 2010 order to this court. This court certified the case to the Supreme Court pursuant to RCW 2.06.030 and RAP 4.4.

On April 11, 2013, the Washington Supreme Court reversed the trial court's grant of summary judgment to Gaston Cornu-Labat. *Cornu-Labat v. Hosp. Dist. No. 2*, 177 Wn.2d 221, 298 P.3d 741 (2013). The Supreme Court agreed with the trial court insofar as it found RCW 70.41.200 did not apply. Nevertheless, the state high court disagreed with the trial court's interpretation of RCW 4.24.250. The Supreme Court determined that a regularly constituted review committee, as provided in the statute, could include nonphysicians. The court held that issues of material fact remain regarding whether the QVMC officials that investigated Dr. Cornu-Labat acted as agents of a regularly constituted committee under RCW 4.24.250, or as an ad hoc investigative team, when the officials acted under the auspices of the medical staff. The court also held that questions exist as to what review mechanism the hospital utilized in investigating Dr. Cornu-Labat. The trial court needed to determine if that mechanism was the disruptive behavior policy, which does not require participation of a regularly constituted committee, or article VIII, which does.

8

As a matter of first impression, the Supreme Court also held that RCW 70.44.062 could provide an exemption under the PRA. In so ruling, our high court reasoned that, in order to qualify for the exemption, QVMC must demonstrate that the withheld records concerned Gaston Cornu-Labat's clinical privileges and were created during proceedings of the board of commissioners, its staff, or agents. As this exemption had not previously existed, the Supreme Court again remanded for the trial court to determine its applicability since factual issues remained. The court noted that only the minutes of a formal meeting of the board's staff or agents qualified for the exemption.

In the second paragraph of its opinion, the Supreme Court, in *Cornu-Labat v. Hospital District No. 2*, wrote:

> The trial court granted summary judgment in favor of Dr. Cornu-Labat, holding none of the PRA exemptions invoked by QVMC applied. The court concluded that the records of a peer review committee that contained nonphysicians could not qualify for the exemption in RCW 4.24.250. This was error. *We remand because questions of material fact remain* as to whether the records at issue were prepared for a regularly constituted peer review body under RCW 4.24.250. *Questions also remain* as to whether any records were generated during a confidential meeting of agents of the QVMC board concerning Dr. Cornu-Labat's clinical or staff privileges. We affirm the trial court's conclusion that the exemption for quality improvement committees, RCW 70.41.200, does not apply under these facts.

*Cornu-Labat*, 177 Wn.2d at 226 (emphasis added). The Supreme Court concluded its opinion with instructions for the parties and the trial court:

> We remand for determination of whether the group investigating Dr. Cornu-Labat constituted a "regularly constituted committee" or the agents

of such a committee under RCW 4.24.250(1). In addition, the trial court should decipher if any of the withheld records constitute proceedings of the board of a public hospital district or its staff or agents concerning the status of a physician's clinical privileges under RCW 70.44.062 . . . Attorney fees, costs, and penalties are available to the extent the trial court finds any of the withheld records are not exempt from disclosure.

*Cornu-Labat*, 177 Wn.2d at 241 (footnote omitted).

After remand and in October 2013, QVMC again moved for summary judgment. In support of its motion, the only new evidence submitted by QVMC was a declaration from Mehdi Merred. Gaston Cornu-Labat cross-moved for summary judgment.

On December 17, 2013, the trial court denied both parties' motions. In its third letter opinion in this case, the trial court found:

> This court is charged with making that factual determination in regard to both investigations—the first, conducted by Vance and Merred, and the second, conducted by Vance, Merred, and Gonzalez. That determination can be made in either of two ways—by trial if there is a genuine dispute as to that fact, or by summary judgment if there is no genuine dispute. If summary judgment is appropriate, it would have to be based upon new declarations added to the record which the Supreme Court already found did not resolve the issue.

CP at 788. The court noted that only one new declaration had been filed by Mehdi Merred. However, the court did not find it helpful:

> In the face of the Supreme Court's pronouncement that which procedure was employed—Article VIII or the disruptive behavior policy—would shed light on the factual dispute, Mr. Merred declares that both investigations were conducted under both authorities. In the face of the Court's pronouncement that the exemption may apply to one investigation and not the other, Mr. Merred declares that both investigations were conducted for the same, unitary purpose: to consider negative action

10

regarding Plaintiff's clinical privileges. In the face of the Court's designation that the "regularly constituted committee" on which the factual dispute focuses in the QVMC medical staff, Mr. Merred declares that both investigations were conducted by QVMC's *Board* or its staff or agents.

In short, Mr. Merred's declaration not only fails to resolve the factual question posited by the Supreme Court, it brings even more uncertainty to it. His conclusory statements on the issues noted above (for the most part, not factual assertions at all) also contradict other declarations filed by Plaintiff, such as the declaration of Glenda Bishop that both investigations were conducted pursuant to Article VIII. Ms. Bishop declares that Plaintiff was advised at the time that the investigations were being conducted pursuant to Article VIII, while Mr. Merred declares that he advised Plaintiff the investigations were being conducted under both authorities.

CP at 788. In short, the trial court ruled that genuine issues of material fact remained as to whether RCW 4.24.250 or RCW 70.44.062 exempted from public disclosure the records sought by Cornu-Labat. The trial court also certified that its order denying summary judgment entailed a controlling question of law that engenders legitimate differences of opinion and immediate review by this court of the question could advance the ultimate termination of the litigation.

On June 26, 2014, this court's commissioner granted QVMC's motion for discretionary review. Commissioner's ruling, *Cornu-Labat v. Hosp. Dist. # 2*, No. 32436-2-III (Wash. June 26, 2014).

## LAW AND ANALYSIS

We note that our concurring brother wishes to summarily dispose of this case on the ground that discretionary review was improvidently granted. We agree that review

11

should not have been granted for the reasons stated in the concurrence. We also agree

that this court's ruling that discretionary review was improvidently granted would be the

better and more convenient method of disposing of the case. Nevertheless, we question

our authority to avoid discretionary review under the circumstances.

Our court commissioner granted discretionary review. RAP 17.7 reads,

concerning commissioner rulings:

> An aggrieved person may object to a ruling of a commissioner or
> clerk, including transfer of the case to the Court of Appeals under rule
> 17.2(c), only by a motion to modify the ruling directed to the judges of the
> court served by the commissioner or clerk. The motion to modify the
> ruling must be served on all persons entitled to notice of the original motion
> and filed in the appellate court not later than 30 days after the ruling is
> filed.

RAP 17.7 suggests that a commissioner's ruling, including a ruling granting discretionary

review, is final unless challenged within thirty days. Gaston Cornu-Labat did not

challenge our commissioner's grant of discretionary review. Therefore, we base our

decision on another ground.

QVMC asks this reviewing court to reverse the trial court and grant it summary

judgment. Despite not renewing a motion below, Gaston Cornu-Labat also asks this

appellate court to grant him judgment as a matter of law. We decline both parties'

request. We hold that, under the law of the case, the Supreme Court intended for the trial

court to resolve the case by resolving facts after a trial. The court specifically remanded

the case because of material questions of fact as to whether one or both of the PRA exemptions shielded the records sought by Cornu-Labat.

The law of the case is a doctrine that derives from both RAP 2.5(c)(2) and common law. *Roberson v. Perez*, 156 Wn.2d 33, 41, 123 P.3d 844 (2005). This multifaceted doctrine means different things in different circumstances. *Lutheran Day Care v. Snohomish County*, 119 Wn.2d 91, 113, 829 P.2d 746 (1992). In its most common form and the form in which we apply the tenet in this appeal, the law of the case doctrine stands for the proposition that, once there is an appellate holding enunciating a principle of law, that holding will be followed in subsequent stages of the same litigation. *Lutheran Day Care v. Snohomish County*, 119 Wn.2d at 113 (1992) (citing 15 LEWIS H. ORLAND & KARL B. TEGLAND, WASHINGTON PRACTICE: JUDGMENTS § 380, at 55-56 (4th ed. 1986)). Stated differently, when a prior appeal determined the applicable law, the law of the case doctrine ordinarily precludes redeciding the same legal issues in a subsequent appeal. *State v. Worl*, 129 Wn.2d 416, 425, 918 P.2d 905 (1996); *Sambasivan v. Kadlec Med. Ctr.*, 184 Wn. App. 567, 576, 338 P.3d 860 (2014).

In all of its various formulations the doctrine seeks to promote finality and efficiency in the judicial process. *Roberson v. Perez*, 156 Wn.2d at 41 (2005); *see also* 5 AM.JUR.2D *Appellate Review* § 605 (1995). The courts apply the doctrine in order to avoid indefinite relitigation of the same issue, to obtain consistent results in the same litigation, to afford one opportunity for argument and decision of the matter at issue, and

to assure the obedience of lower courts to the decisions of appellate courts. *State v. Harrison*, 148 Wn.2d 550, 562, 61 P.3d 1104 (2003); 5 AM.JUR.2D *Appellate Review* § 566 (2015).

Contrary to the comment in *Roberson v. Perez*, 156 Wn.2d at 41, RAP 2.5(c)(2) did not create the law of the case doctrine, but rather restricts the tenet. RAP 2.5 reads:

> **(c) Law of the Case Doctrine Restricted.** The following provisions apply if the same case is again before the appellate court following a remand:
> (1) *Prior Trial Court Action.* If a trial court decision is otherwise properly before the appellate court, the appellate court may at the instance of a party review and determine the propriety of a decision of the trial court even though a similar decision was not disputed in an earlier review of the same case.
> (2) *Prior Appellate Court Decision.* The appellate court may at the instance of a party review the propriety of an earlier decision of the appellate court in the same case and, where justice would best be served, decide the case on the basis of the appellate court's opinion of the law at the time of the later review.

By using the term "may," RAP 2.5(c)(2) is written in discretionary, rather than mandatory, terms, such that its restriction of the doctrine is optional. *Folsom v. County of Spokane*, 111 Wn.2d 256, 264, 759 P.2d 1196 (1988). RAP 2.5(c)(2) codifies at least two historically recognized exceptions to the law of the case doctrine that operate independently. *Roberson v. Perez*, 156 Wn.2d at 42 (2005). First, application of the doctrine may be avoided when the prior decision is clearly erroneous and the erroneous decision would work a manifest injustice to one party. *First Small Bus. Inv. Co. of Cal. v. Intercapital Corp. of Or.*, 108 Wn.2d 324, 333, 738 P.2d 263 (1987). This common

14

sense formulation of the doctrine assures that an appellate court is not obliged to perpetuate its own error. *Roberson v. Perez*, 156 Wn.2d at 42. Second, application of the doctrine may also be avoided on an intervening change in controlling precedent between trial and appeal. *Roberson v. Perez*, 156 Wn.2d at 42.

None of the exceptions to the law of the case dogma apply in this appeal. First, even if we believed the Supreme Court's earlier decision constituted clear error, this lower appellate court lacks authority to declare a Supreme Court decision clearly erroneous. Instead, we respect the Supreme Court's ruling as should the litigants. Second, the law with regard to the exemptions asserted by QVMC has not changed.

We might decline to apply the law of the case if one or both parties introduced new, significant facts by declaration in support of a renewed summary judgment motion. We agree, however, with the trial court that the new declaration of Mehdi Merred presents few, if any, new facts and only muddles the issues of fact. Merred's second declaration, like most of QVMC witness declarations, provides few details of the background of the dispute and the committees formed to address complaints about Gaston Cornu-Labat. Instead, the declarations employ conclusory words designed to support QVMC's legal contentions.

Even assuming facts to be undisputed, different inferences may be drawn from the facts. A summary judgment motion should be denied if the evidence and inferences create any question of material fact. *DeYoung v. Providence Med. Ctr.*, 136 Wn.2d 136,

15

140, 960 P.2d 919 (1998); *Hough v. Ballard*, 108 Wn. App. 272, 278, 31 P.3d 6 (2001). The parties and the courts are best served by a full evidentiary hearing, during which witnesses are subject to cross-examination and the trial court may observe witnesses' demeanor.

We note that the subject documents have not been presented to this court in camera. We would be reluctant to decide the important legal issues without the opportunity to review the records. The trial court should be given the opportunity when addressing the exemptions to review the records in private. Many times the best way for a court to accurately determine what portions, if any, of public records are exempt from disclosure is by an in camera review of the records. *Limstrom v. Ladenburg*, 136 Wn.2d 595, 615, 963 P.2d 869 (1998).

The Supreme Court remanded the case on appeal because of questions of fact. The doctrine of the law of the case is generally stated in terms of following "a principle of law" or deciding a legal issue. The Supreme Court's ruling, upon which we rely in this appeal, may be more in the nature of a holding than an announcement of a legal principle. Nevertheless, the law of the case also applies to "decisions," "rulings," or "holdings" of an appellate court. *State v. Schwab*, 163 Wn.2d 664, 672, 185 P.3d 1151 (2008); *City of Camas v. Kiggins*, 120 Wash. 40, 44, 206 P. 951 (1922).

An early, but parallel, decision of our high court is *City of Camas v. Kiggins*, 120 Wash. 40 (1922). The small city of Camas prosecuted J. P. Kiggins and J. K. McGill

16

under a city ordinance. In an earlier appeal, the Supreme Court affirmed a denial of the defendants' motion to change venue from Camas police court to the Clarke County justice of the peace court. During the second appeal, the Supreme Court declared its earlier "decisions" involving venue to be the law of the case. 120 Wash. at 44.

CONCLUSION

We affirm the trial court's denial of the parties' renewed summary judgment motions and remand for trial.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

I CONCUR:

_____
Lawrence-Berrey, J.

17

No. 32436-2-III

BROWN, A.C.J. (concurring in result) — RAP 2.3(b)(2) permits discretionary review if two requirements are fulfilled: probable error and substantial alteration of the status quo as a result of the superior court decision. Considering the parties' briefing concerning the trial court's decision to deny summary judgment, I would conclude the requirements of RAP 2.3(b)(2) for accepting review were not met. The trial court's rulings do not render continued proceedings useless, substantially alter the status quo, or so limit the freedom of a party to act as to call for interlocutory review. *See State v. Powell*, 126 Wn.2d 244, 257, 893 P.2d 615 (1995). Moreover, the trial court's well-articulated view that material facts remain for trial is aptly framed, not probable error, and consistent with the Supreme Court's remand order.

Because I would hold discretionary review was improvidently granted and dismiss this review, I concur in the result.

Brown, A.C.J.