[No. 26626-5-III. Division Three. March 17, 2009.]

CHERYL L. HOLLENBACK, *Appellant*, v. SHRINERS HOSPITALS FOR CHILDREN, *Respondent*.

---

812

*Michael J. McMahon* and *Jennifer C. Underwood* (of *Etter, McMahon, Lamberson, Clary & Oreskovich, PC*), for appellant.

*James M. Kalamon* (of *Paine Hamblen, LLP*), for respondent.

¶1 KULIK, A.C.J. — In 1996, Cheryl Hollenback was hired as an at-will employee by Shriners Hospitals for Children in Spokane, Washington. At the time she was terminated in 2006, Ms. Hollenback held the position of director of patient care services, one of three top management positions at Shriners. Ms. Hollenback reported harassment, discrimination, and fear of retaliation to Shriners resulting from problems caused by Chief of Staff Dr. Ronny Ferguson's romantic relationship with one of Ms. Hollenback's subordinates. Ultimately, Dr. Ferguson resigned, and Shriners terminated Ms. Hollenback.

¶2 Ms. Hollenback filed this action alleging retaliation, failure to provide specific treatment in specific situations, breach of contract, and wrongful discharge in violation of public policy. The trial court granted summary judgment in favor of Shriners and dismissed all of Ms. Hollenback's claims. Ms. Hollenback appeals. We affirm the trial court's dismissal of Ms. Hollenback's claims of wrongful discharge, failure to provide specific treatment, and breach of contract. We reverse the trial court's dismissal of her claim for retaliation.

## FACTS

¶3 In 1996, Ms. Hollenback began working for Shriners as the director of nursing. On her job application, she acknowledged that her employment would be at-will and that only the chairman of the Board of Trustees of Shriners Hospitals had the authority to alter the at-will relationship and that any alteration must be in writing. Once on the job, Ms. Hollenback received a copy of *Shriners Hospitals for Children Employee Handbook* (Employee Handbook). She signed a document dated August 1, 1996, acknowledging her receipt of the handbook and her at-will employment at Shriners.

¶4 The Employee Handbook contains several policies, including an at-will employee policy and a policy concerning disciplinary procedures. The disciplinary policy states, in

part, that "[t]ermination of employment may be warranted for severe actions without prior disciplinary action." Clerk's Papers (CP) at 160. Ms. Hollenback was aware that as a Shriners employee she could be terminated for severe infractions.

¶5 *2003 Site Visit.* One year after she was hired, Ms. Hollenback was promoted to director of patient care services (DPCS). In that position, Ms. Hollenback held one of three top management positions at Shriners. This group of managers was known as the "Triad." The two other members of the Triad were the chief of staff, Dr. Ronny Ferguson, and the hospital administrator, Charles Young.

¶6 In April 2003, Shriners adopted a new reporting structure. Under the new structure, Ms. Hollenback, as the DPCS, was to report to the hospital administrator, Mr. Young, for all nonpatient care issues, and to the chief of staff, Dr. Ferguson, for all patient care issues.

¶7 In August 2003, an investigative team conducted a site visit at Shriners to evaluate its strengths and weaknesses. The team consisted of several individuals from Shriners corporate headquarters in Florida and members of the local Board of Governors. The investigative team concluded that the most significant concern at Shriners was that the Triad was struggling to work together as a team.

¶8 Ms. Hollenback believed that the Triad was experiencing problems because of Dr. Ferguson's conduct. She felt that Dr. Ferguson was inconsistent and unsupportive, and an ineffective leader.

¶9 *Ferguson/Blakely Relationship.* Initially, the relationships within the Triad members improved after the 2003 site visit. However, by spring 2005, communication among the members began to deteriorate. Ms. Hollenback felt that one of the reasons for the deterioration was that Karen Blakely, who reported to Ms. Hollenback, was in a romantic relationship with Dr. Ferguson.

¶10 In late 2005, Ms. Hollenback counseled Ms. Blakely on her performance and gave her a verbal warning. When

Dr. Ferguson learned that Ms. Hollenback had disciplined Ms. Blakely, he contacted the local chairman of the Board of Governors, Lawrence Tassie, and told him that he wanted Ms. Hollenback removed from her job.

¶11 *December Investigation.* Mr. Young and Dr. Ferguson each contacted Mr. Tassie about the problems between Dr. Ferguson and Ms. Hollenback. On December 12, 2005, Mr. Tassie contacted the corporate chairman of the Board of Trustees, Ralph Semb, and notified him that the Triad was continuing to have difficulties. Mr. Semb decided to send a team from corporate Shriners to investigate.

¶12 On December 28, the investigative team from corporate Shriners arrived in Spokane. The investigative team met with various employees. Ms. Hollenback told the team that she felt that Dr. Ferguson's relationship with Ms. Blakely had a negative impact on the hospital. During her meeting with the team, Ms. Hollenback was told that there was to be no retaliation against any employee who talked to the team. Ms. Hollenback admitted that she had an obligation to comply with the prohibition against retaliation and to avoid anything that would be perceived as retaliation.

¶13 During the investigation, Mr. Tassie and the members of corporate Shriners had discussions on how to resolve the problems with the Triad. Mr. Semb suggested releasing all three members of the Triad, but no decision was reached. Corporate Shriners' investigative team began a second round of meetings on January 23 and 24, 2006.

¶14 *Ms. Hollenback's Letter to Mr. Young.* Prior to the arrival of the investigative team, Ms. Hollenback gave Mr. Young an undated letter. In the letter, Ms. Hollenback stated that she was the subject of harassment as the direct result of Dr. Ferguson's relationship with Ms. Blakely. Ms. Hollenback also stated that Dr. Ferguson had retaliated against her for counseling Ms. Blakely. Ms. Hollenback expressed her fear that Dr. Ferguson would retaliate against her for reporting these problems.

¶15 On January 6, Ms. Hollenback gave the letter to Mr. Tassie, who shared the letter with Mr. Semb. Sometime

after the December visit and before the January visit, Mr. Tassie told Ms. Hollenback that her performance was not being reviewed by the team.

¶16 *January Investigation.* Ms. Blakely resigned from Shriners on January 11, 2006, effective January 23. On January 23, the investigative team returned to Spokane. Several employees contacted Mr. Semb and asked to speak with him about their concerns related to Shriners Hospital.

¶17 On January 24, Mr. Semb held an all-staff town hall meeting. Ms. Hollenback attended this meeting. During the meeting, Mr. Semb explained that the investigative team was there to address some grave issues. Mr. Semb also said that there would be no retaliation against employees who met with the team and that any retaliation would be dealt with severely.

¶18 After the town hall meeting, Mr. Semb again reminded Ms. Hollenback and Mr. Young that they were not to retaliate against any employees who spoke to the team or to engage in any conduct that could be perceived as retaliation.

¶19 On January 25, Mr. Tassie informed Mr. Young that his job and Ms. Hollenback's job were safe. Mr. Young relayed this conversation to Ms. Hollenback. Mr. Tassie also informed Odetta Madaj, Shriners' human resource director, and Margreta Kilgore, Shriners' director of fiscal services, that Ms. Hollenback and Mr. Young were not going to be terminated. After the investigative team left Spokane, Dr. Ferguson resigned his position.

¶20 *Ethics Committee Meeting.* On January 25, Shriners' Ethics Committee held a meeting. The individuals attending the meeting included Mr. Young, Ms. Hollenback, Mary Ann Henderson, Ms. Kilgore, and Sherry Nerger. Ms. Kilgore and Ms. Nerger each prepared a memorandum setting forth what transpired at the meeting.

¶21 According to Ms. Nerger, Ms. Henderson criticized the town hall meeting as being a " 'bust.' " CP at 213. She was also unhappy that the investigative team spoke only to

those people who e-mailed to complain, while ignoring those people who had positive comments to make. Ms. Nerger wrote that Ms. Henderson referred to those who e-mailed to complain as " 'tattletales,' " and that Mr. Young said that he had been unable to find out the identities of the 13 people who met with the team. CP at 213.

¶22 Ms. Nerger, who had also spoken to the investigative team, "would have liked to crawl under the table." CP at 213. She kept telling herself not to let her body language give herself away. She expressed frustration that "neither [Mr. Young] nor [Ms. Hollenback] did anything to stop it—in fact [Mr. Young] fed into the whole thing." CP at 213. Ms. Nerger wrote:

> I can only say how it makes me feel. I am totally afraid of being identified as someone who was interviewed. [Mr. Young] and [Ms. Hollenback] were not trying to shut the talk down. [Mr. Young] was much more verbal than [Ms. Hollenback]. It has since escalated to our own department where the anesthesiologists are on a witch-hunt.

CP at 213.

¶23 Ms. Kilgore also reported that neither Mr. Young nor Ms. Hollenback made any attempt to imply that Ms. Henderson's perceptions were incorrect. To Ms. Kilgore, their silence implied agreement with the labels used by Ms. Henderson. In Ms. Kilgore's view, the employees who spoke to the team answered hard questions because they cared about the hospital, the children, and the staff.

¶24 After the meeting, Ms. Kilgore and Ms. Nerger spoke with Ms. Madaj about their concerns.

¶25 *Executive Staff Meeting.* On January 26, Shriners held its weekly executive staff meeting. Those in attendance included Mr. Young, Ms. Hollenback, Ms. Madaj, and Ms. Kilgore. Ms. Madaj made a written account of the meeting.

¶26 During the meeting, Ms. Hollenback and Mr. Young criticized the town hall meeting. Negative comments were made about " 'those people' " who spoke to the investigative

team, and negative comments were made about the corporate people. CP at 217.

¶27 *Termination.* After the executive staff meeting, Ms. Madaj provided copies of her notes to Corporate Director of Human Resources Kathy Dean, along with copies of the memoranda from Ms. Kilgore and Ms. Nerger from the January 26 Ethics Committee meeting. Ms. Dean informed Mr. Semb of the documentation by Ms. Kilgore and Ms. Nerger of their concerns about retaliation. Mr. Semb met with his leadership team, and a unanimous decision was made to terminate Ms. Hollenback and Mr. Young.

¶28 *Employment Security Documents.* After Ms. Hollenback was terminated, she filed a statement of discharge with the Employment Security Department. She wrote the reason for her termination was "[u]nclear to me. Chairman of the Board of Trustees asked for my resignation[.] Said I discussed 'town hall' meeting and, as a hospital leader, I did not stop 'someone' else from discussing meeting in Ethic's [sic] Committee & Executive Staff Meetings." CP at 221.

¶29 Shriners filed a response to Ms. Hollenback's statement, stating, "Top 3 leadership positions unable to work together—all three released from employment. No misconduct on her part." CP at 223. Ms. Madaj filled out this form. She was directed not to fight Ms. Hollenback's claim.

¶30 *Procedural History.* Ms. Hollenback filed suit against Shriners. In answers to discovery, Shriners stated for the first time that Ms. Hollenback was terminated for attempting to obtain information gathered during the corporate Shriners' interviews and for violating corporate Shriners' instructions to "take no action regarding the interviews until a final decision came back from the leadership team." CP at 297.

¶31 Shriners moved for summary judgment. The court granted summary judgment in favor of Shriners on all claims. This appeal followed.

## ANALYSIS

¶32 Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). When reviewing a summary judgment order, an appellate court engages in the same inquiry as the trial court. *Id.* "The facts and reasonable inferences from the facts are considered in the light most favorable to the nonmoving party." *Bishop v. Miche*, 137 Wn.2d 518, 523, 973 P.2d 465 (1999). Conclusions of law are reviewed de novo. *Id.*

I. RETALIATION

■■ ¶33 Initially, Ms. Hollenback must demonstrate a prima facie case of retaliation. *See Renz v. Spokane Eye Clinic, PS*, 114 Wn. App. 611, 618, 60 P.3d 106 (2002). RCW 49.60.210 prohibits employers from terminating employees for opposing acts violating the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW. To maintain her retaliation claim, Ms. Hollenback must establish that (1) she participated in a statutorily protected activity, (2) an adverse employment action was taken against her, and (3) her activity and the employer's adverse action were causally connected. *See Delahunty v. Cahoon*, 66 Wn. App. 829, 839-41, 832 P.2d 1378 (1992).

■ ¶34 The conduct complained of need not actually be unlawful; the employee must establish only that he or she reasonably believed that the employer's conduct was discriminatory. *Renz*, 114 Wn. App. at 619.

¶35 *Statutorily Protected Activity.* To prove her retaliation claim, Ms. Hollenback must first demonstrate that she participated in a statutorily protected activity.

¶36 Whether Ms. Hollenback engaged in a protected activity was not an issue before the trial court. Shriners admitted in its answer and affirmative defense to plaintiff's complaint:

13. Admits that Plaintiff had a right to notify Shriners of her fears regarding retaliation under the Washington Law Against Discrimination, and under Shriners' Administrative Manual, which states that employees who feel that they have not been fairly treated may file a complaint and no employee will be subject to reprimand or harassment as a result of initiating a complaint, and further admits that pursuant to Washington law and Shriners' Administrative Manual, Mr. Tassie told Plaintiff she would not be retaliated against relative to her writing and presenting the letter, as alleged in Paragraph 13 thereof, but otherwise specifically denies each and every other allegation contained in said Paragraph.

CP at 11.

¶37 Relying on *Brundridge v. Fluor Federal Services, Inc.*, 164 Wn.2d 432, 191 P.3d 879 (2008), Ms. Hollenback contends that Shriners waived the right to challenge her assertion that she participated in a statutorily protected activity. In *Brundridge*, pipe fitters filed an action against their former employer, Fluor Federal Services, Inc., for wrongful discharge. *Id.* at 437. Fluor's counsel failed to dispute two elements at trial and acknowledged that a different issue of fact was the only one remaining for the jury. *Id.* at 442. Fluor also made no comment when Mr. Brundridge's counsel stated that the only issue in the trial was causation. Fluor did not argue the two elements during the trial and did not request the relevant jury instructions. The court found that Fluor had waived the right to challenge these elements. *Id.*

¶38 Here, Shriners framed the issues raised in the context of a summary judgment motion, not a trial. The issue of whether Ms. Hollenback participated in a statutorily protected activity was not raised in Shriners' summary judgment brief. When asked by the court, Shriners' counsel told the court that Ms. Hollenback had engaged in an oppositional activity. Based on its concession, Shriners waived the right to contest the issue of statutorily protected activity.

¶39 The trial court erred by concluding that Ms. Hollenback's actions were not protected under RCW 49.60.210.

¶40 *Participation in the Protected Activity Caused Termination.* If Ms. Hollenback demonstrates a prima facie case, the evidentiary burden shifts to the employer to produce admissible evidence of a legitimate, nonretaliatory reason for the discharge. *Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d 355, 363-64, 753 P.2d 517 (1988). If the employer meets its burden and produces some evidence of a nonretaliatory reason for the discharge, the presumption of retaliatory discharge established by the prima facie evidence is removed. *Renz*, 114 Wn. App. at 618. To avoid summary judgment, the employee must then establish a genuine issue of material fact by showing that the employer's stated reason for the adverse employment action was a pretext for a discriminatory or retaliatory purpose. *Id.* at 618-19.

¶41 " 'Because employers rarely will reveal they are motivated by retaliation, plaintiffs ordinarily must resort to circumstantial evidence to demonstrate retaliatory purpose.' " *Francom v. Costco Wholesale Corp.*, 98 Wn. App. 845, 862, 991 P.2d 1182 (2000) (quoting *Vasquez v. State*, 94 Wn. App. 976, 985, 974 P.2d 348 (1999)). "The plaintiff need not show that retaliation was the only or 'but for' cause of the adverse employment action, but he or she must establish that it was at least a substantial factor." *Id.* (citing *Allison v. Hous. Auth.*, 118 Wn.2d 79, 85-96, 821 P.2d 34 (1991)). One factor supporting a retaliatory motive is a close proximity in time between the protected activity and the employment action. *Id.*

¶42 Prior to her termination, Ms. Hollenback's performance was considered excellent and Shriners determined that she was a "very good director of patient care service." CP at 357. Yet, she was terminated on January 28, 2006, less than two months after she wrote the letter to Mr. Young complaining of harassment, discrimination, and her fear of retaliation, including job loss. In *Estevez v. Faculty Club of*

*University of Washington*, 129 Wn. App. 774, 801-04, 120 P.3d 579 (2005), the court remanded a retaliation claim for trial, concluding that there were reasonable but competing inferences of both discrimination and nondiscrimination where evidence showed that prior to discharge, the employee received only positive feedback.

¶43 Shriners contends that Ms. Hollenback was terminated for her failure to follow explicit directions from Mr. Semb and for engaging in retaliatory conduct at the executive staff meeting and the Ethics Committee meeting. Shriners points to the written statements made by Ms. Kilgore and Ms. Nerger. Ms. Kilgore implied that Ms. Hollenback called people tattletales. But Ms. Nerger attributed this statement to someone else. Ms. Kilgore wrote that Ms. Hollenback "made some comment that some of those who spoke were probably shaking in their boots or felt like tattle tails [sic] but it implied to me that those questioned by the committee were being labeled." CP at 315. But Ms. Nerger implied that Ms. Hollenback did not talk at the meeting.

¶44 Ms. Hollenback contends that Shriners' justification for her discharge was pretext for a retaliatory motive. Pretext may be shown with evidence that (1) the reasons given have no basis in fact; (2) even if the reasons are based in fact, the employer was not motivated by these reasons; or (3) the reasons are insufficient to motivate an adverse employment decision. *Renz*, 114 Wn. App. at 619.

¶45 Ms. Hollenback again points out corporate Shriners arrived to investigate only after Ms. Hollenback gave her letter to Mr. Young. Ms. Hollenback also asserts that there is a question of fact as to when the investigative team reached a decision to continue her job because Mr. Semb argued for her termination during the first round of interviews.

¶46 Importantly, Shriners responded to Ms. Hollenback's unemployment benefits claim in a manner that undermines its position. On the employment security form, Shriners stated that there was "[n]o misconduct on her part" and that she was "[u]nable to do the job through no fault of [her]

own." CP at 294. Finally, there is a question of fact as to whether Ms. Hollenback's acts violated Mr. Semb's directive and whether the acts alleged justify termination.

¶47 Taking the facts in the light most favorable to Ms. Hollenback, there are competing inferences as to whether Ms. Hollenback's participation in the protected activity caused her termination. We remand this claim for resolution of the remaining question as to whether Ms. Hollenback's activity and her employer's adverse action were causally connected.

## II. WRONGFUL DISCHARGE

¶48 At common law, an at-will employee can be discharged for any reason. *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 935, 913 P.2d 377 (1996). The common law tort of wrongful discharge is an exception to the terminable-at-will doctrine. *Id.* This tort applies when an employer discharges an employee for reasons contrary to public policy. *Id.* For example, in *Roberts v. Dudley*, 140 Wn.2d 58, 77, 993 P.2d 901 (2000), the Supreme Court held that a cause of action for wrongful discharge could be based on the clearly articulated public policy against sex discrimination found in the WLAD, chapter 49.20 RCW, and RCW 49.60.010.

¶49 To qualify as a public policy for purposes of the wrongful discharge tort, a policy must be "truly public" and sufficiently clear. *Sedlacek v. Hillis*, 145 Wn.2d 379, 389, 36 P.3d 1014 (2001). The tort of wrongful discharge should be narrowly construed to prevent frivolous lawsuits. *Gardner*, 128 Wn.2d at 936. Generally, Washington courts have recognized the public policy exception when an employer discharges an employee (1) because of the employee's refusal to commit an illegal act, (2) because of the employee's performance of a public duty or obligation, (3) because of the employee's exercise of a legal right or obligation, or (4) in retaliation for reporting employer misconduct. *Id.* at 935-36.

¶50 To prove a claim for a wrongful discharge in violation of public policy, Ms. Hollenback must establish (1) the existence of a clear public policy, known as the clarity element; (2) that discouraging the conduct in which Ms. Hollenback engaged would jeopardize the public policy, known as the jeopardy element; (3) that the public policy-linked conduct caused dismissal, known as the causation element; and (4) that Shriners cannot offer an overriding justification for the dismissal, known as the absence of justification element. *See id.* at 941.

¶51 Shriners has conceded that Ms. Hollenback was involved in statutorily protected opposition activity. To meet the jeopardy element, a claimant must prove that his or her conduct " *'directly relates* to the public policy, or was *necessary* for the effective enforcement of the public policy. This burden requires a plaintiff to "argue that other means for promoting the policy . . . are inadequate." ' " *Brundridge*, 164 Wn.2d at 440 (alteration in original) (quoting *Gardner*, 128 Wn.2d at 945 (quoting HENRY H. PERRITT, JR., WORKPLACE TORTS: RIGHTS AND LIABILITIES § 3.14, at 77 (1991))).

¶52 Ms. Hollenback fails to raise an issue of material fact concerning the jeopardy element. *See Danny v. Laidlaw Transit Servs., Inc.*, 165 Wn.2d 200, 223, 193 P.3d 128 (2008). The trial court properly dismissed her claim for wrongful discharge.

III. SPECIFIC TREATMENT IN SPECIFIC CIRCUMSTANCES

¶53 Promises of specific treatment in specific circumstances are enforceable against the employer when the employee relies upon the promises in a handbook and the promises are breached by the employer. *Bulman v. Safeway, Inc.*, 144 Wn.2d 335, 354, 27 P.3d 1172 (2001). However, where the employee handbook gives the employer discretion when applying disciplinary procedures, the manual does not provide a promise of specific treatment in a specific circumstance. *Drobny v. Boeing Co.*, 80 Wn. App. 97, 103, 907 P.2d 299 (1995).

¶54 Ms. Hollenback relies on *Payne v. Sunnyside Community Hospital*, 78 Wn. App. 34, 894 P.2d 1379 (1995). In *Payne*, the employer's policy manual disclaimed any intent to change the at-will status of its employees, but the manual also set forth mandatory progressive discipline procedures. The employer testified that the progressive policy was mandatory. *Id.* at 42-43. The court found that summary judgment was inappropriate in light of the issues of fact as to whether the employer intended to change the at-will relationship. *Id.*

¶55 Ms. Hollenback admits that she was an at-will employee. She admitted this fact on her application for employment and on the acknowledgment sheet when she received her Employee Handbook. The Employee Handbook was in effect when she was terminated.

¶56 The Employee Handbook states that "[t]his handbook is not a contract, express or implied. It does not guarantee employment for any specific duration or specific treatment during employment." CP at 156. In the handbook policy concerning disciplinary actions, Shriners had the discretion to select what discipline measure to apply. The policy states:

> Employment at [Shriners' Hospital for Children (SHC)] is at will. Nothing in this disciplinary policy should be construed to change your "at will" status.
>
> SHC reserves the right to select appropriate discipline at any time dependent upon circumstances.

CP at 159. Significantly, Shriners' policy also states that "[t]ermination of employment may be warranted for severe actions without prior disciplinary action." CP at 160.

¶57 The Employee Handbook grants Shriners discretion when applying disciplinary policies. The handbook does not provide a promise of specific treatment in a specific circumstance.

¶58 Ms. Hollenback next argues that a promise of specific treatment was made in Shriners' local policy, which outlines progressive disciplinary measures that begin with

a verbal warning and progress to discharge. Ms. Hollenback maintains that she relied on the local progressive discipline policies and used them when dealing with Ms. Blakely. Ms. Hollenback points out that Ms. Madaj admitted that she could not identify one person in a management position who had ever been terminated without progressive discipline.

¶59 Shriners asserts that the local progressive discipline policies were in draft form and were never adopted by Shriners. Moreover, Shriners points out that Ms. Hollenback admitted that she did not have to use progressive discipline and could have gone directly to immediate termination with Ms. Blakely.

¶60 The local progressive discipline policy was not mandatory. The draft policy provided that disciplinary action could be taken utilizing any or all methods set forth, including discharge, without prior verbal or written counseling, suspension, or probation.

¶61 There is no evidence that Shriners acted inconsistently with this disclaimer. Even though Ms. Madaj stated that no manager had been terminated without progressive discipline, there is no indication that any manager other than Ms. Hollenback was terminated for severe conduct.

¶62 Finally, Ms. Hollenback contends the local policy required Shriners to consider her service with the hospital before her discharge. The local policy states:

> Prior to terminating an employee, consideration must be given to the employee's length of service, promotions, reassignments, counseling and disciplinary actions, documentation in the employee's personnel file, and the employee's performance appraisals.

CP at 259. However, the local disciplinary policy was not mandatory and Shriners was not required to follow this provision when terminating an employee for severe conduct.

¶63 The trial court did not err by dismissing Ms. Hollenback's claim for specific treatment in specific circumstances.

IV. BREACH OF CONTRACT CLAIM

¶64 Ms. Hollenback contends the trial court erred by granting summary judgment dismissal of her breach of oral contract claim. Ms. Hollenback asserts that Mr. Tassie promised that her job would not be in jeopardy if Ms. Hollenback reported Dr. Ferguson's harassment, discrimination, and retaliation. She contends that in exchange for this promise, she did not defend her position at Shriners or take any other action.

¶65 "Employment contracts are governed by the same rules as other contracts." *Kloss v. Honeywell, Inc.*, 77 Wn. App. 294, 298, 890 P.2d 480 (1995). "The burden of proving a contract, whether express or implied, is on the party asserting it, and he [or she] must prove each essential fact, including the existence of a mutual intention." *Cahn v. Foster & Marshall, Inc.*, 33 Wn. App. 838, 840, 658 P.2d 42 (1983). Here, the court held that there was "no evidence or inference that the parties intended to contract or that [Ms. Hollenback] relied on this promise to her detriment." CP at 589.

¶66 At her deposition, Ms. Hollenback stated that the *only* promise Mr. Tassie made to her was the promise that her performance was not being reviewed by the team. Ms. Hollenback agreed that this was Mr. Tassie's opinion. Ms. Hollenback also believed that Mr. Tassie *implied* that "they were not going to act on threats that [Dr. Ferguson] was making to have me removed." CP at 106. She remembers that these comments were made between the visits of the first team and the second team.

¶67 Mr. Tassie's comments do not contain a promise that Ms. Hollenback's job would not be in jeopardy if she reported Dr. Ferguson's harassment, discrimination, and retaliation. No mutual intention was shown. Also, there was no promise that other activity by Ms. Hollenback could not result in termination. And Ms. Hollenback was aware that under the Employee Handbook only Mr. Semb had the authority to enter into an agreement altering her at-will

status. The trial court did not err by dismissing Ms. Hollenback's contract claim.

¶68 We affirm dismissal of Ms. Hollenback's claims of wrongful discharge, specific treatment in specific circumstances, and breach of contract. We reverse the dismissal of Ms. Hollenback's claim for retaliation and remand for trial.

SWEENEY and BROWN, JJ., concur.