IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| VENKATARAMAN SAMBASIVAN, | ) | |
| | ) | No. 31858-3-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KADLEC MEDICAL CENTER, a | ) | |
| corporation, | ) | PUBLISHED OPINION |
| | ) | |
| Respondent. | ) | |

SIDDOWAY, C.J. — Dr. Venkataraman Sambasivan appeals a second summary judgment dismissal of his claims that Kadlec Medical Center retaliated against him for a discrimination lawsuit he filed against the hospital in June 2008. In this court's opinion in *Sambasivan v. Kadlec Medical Center*, noted at 171 Wn. App. 1013, 2012 WL 5208657, at *5, we reversed the trial court's first dismissal of the claims, concluding that "both parties have presented competing evidence and inferences to be drawn" from evidence bearing on a causal link between Dr. Sambasivan's lawsuit and Kadlec's adoption and retroactive application of a proficiency standard that rendered him ineligible for renewal of his interventional cardiology privileges. We held that it was "appropriate for the trier of fact to resolve the issue." *Id.*

Following remand, Kadlec moved for summary judgment on a basis that had been urged in part in its first motion. It argued that Dr. Sambasivan had not identified a contract or employment relationship that would support a retaliation claim and, even if he had, could not show interference with the relationship. The trial court granted the motion and again dismissed Dr. Sambasivan's retaliation claims.

Central to Kadlec's argument in support of the second dismissal is the fact that it retained total discretion to delineate physician privileges. But even if Kadlec has legitimately taken care to reserve its right to exercise discretion for a good reason, a bad reason, or no reason, the harm it is alleged to have caused for an illicit reason falls within the broad scope of 42 U.S.C. § 1981 and RCW 49.60.210(1). We once again reverse and remand the claims for trial.

## FACTS AND PROCEDURAL BACKGROUND

Facts relevant to this second appeal are largely drawn from our opinion in the first. Venkataraman Sambasivan, a native of India, is a board certified interventional cardiologist with a private practice in the Tri-Cities. Kadlec, which operates a hospital in Richland, granted staff privileges to Dr. Sambasivan in 2001.

In 2008, Dr. Sambasivan's clinical privileges were up for renewal. In anticipation of its decision on renewal, the hospital—which had suspended Dr. Sambasivan's privileges and proctored him over concerns in the past—hired an outside professional to review cases of the four interventional cardiologists then on staff. During this process

2

Dr. Sambasivan began to suspect he was being treated differently by the hospital than the other three interventional cardiologists. For that reason, and because he alone among the interventional cardiologists had not been paid to provide call coverage,[1] he sued Kadlec in June 2008, alleging national origin discrimination and five other claims.

Kadlec's board of directors met on August 14, 2008. At that meeting, the board discussed the fact that Dr. Sambasivan had filed the lawsuit. The board also discussed a recommendation made by Kadlec's Medical Executive Committee (MEC) that Dr. Sambasivan be reinstated, but that his acute and emergent surgical procedures be restricted. The board rejected the recommendation and voted to reinstate Dr. Sambasivan without the restrictions.

The board also acted at the meeting on a recommendation that all interventional cardiologists perform a minimum of 150 interventional procedures every two years as a condition to retaining or obtaining interventional cardiology hospital privileges. The volume-based proficiency standard is approved by the American College of Cardiologists and the American Heart Association. Kadlec's Medical Staff Quality Committee and its MEC both recommended that physicians with existing privileges be given a year to come

---

[1] Kaldec's medical staff bylaws and agreements contemplate an emergency room rotation "call" schedule under which interventional cardiologists are assigned responsibility for 24-hour call periods in which they are required to furnish emergency medical/surgical services to medical center patients as needed.

3

into compliance with the new proficiency standard. The board instead chose to give the proficiency standard immediate effect and applied it retroactively.

Dr. Sambasivan was the only interventional cardiologist on staff who failed to meet the standard as retroactively applied. He was ineligible for renewal of his interventional cardiology privileges as a result. Dr. Sambasivan remained on Kadlec's medical staff with privileges to practice noninterventional cardiology.[2]

In 2009, Dr. Sambasivan amended his complaint, dropping his discrimination claim and adding federal and state claims of retaliation. In support of his retaliation claims, he alleged that he had brought an action for damages, including on grounds of unlawful discrimination, and

> 32. In retaliation against the plaintiff for his complaint of unlawful discrimination, the defendant stripped him of his privileges to practice interventional cardiology at the defendant's medical facilities in Richland, Washington. This unlawful and retaliatory action occurred on August 14, 2008.
> 33. By its unlawful, retaliatory action described above, the defendant has violated state and federal law prohibiting retaliation of the sort alleged above.
> 34. As a direct and proximate result of the defendant's retaliation alleged above, the plaintiff has been injured and has sustained economic and noneconomic damages.

Clerk's Papers (CP) at 6.

---

[2] In March 2012, Dr. Sambasivan voluntarily resigned his staff membership and privileges.

In 2010, Kadlec moved for summary judgment dismissal of all of Dr. Sambasivan's claims. The trial court granted the motion as to all of the doctor's claims except his restitution claim for uncompensated call coverage. The restitution claim proceeded to a bench trial at which Dr. Sambasivan prevailed and was awarded damages and his attorney fees related to that claim. The hospital was awarded attorney fees on other claims that it had succeeded in having dismissed.

Both parties appealed. In this court's October 2012 opinion, we reversed the trial court's dismissal of Dr. Sambasivan's federal and state retaliation claims and affirmed the trial court in all other respects. In reversing dismissal of the retaliation claims we focused, as the trial court had, on whether Dr. Sambasivan had presented evidence from which a reasonable jury could find a causal connection between his discrimination lawsuit and the decision of the Kadlec board to adopt and retroactively apply a proficiency standard that would render him ineligible for renewal of his interventional cardiology privileges. Concluding that he had, we remanded the retaliation claim for trial.

Following remand, the trial court conducted a telephonic status conference and invited any further dispositive motions from the parties. Kadlec responded by moving for summary judgment dismissal of Dr. Sambasivan's retaliation claims "because he has not and cannot identify any contract or employment relationship between himself and Kadlec that gives rise to a retaliation claim under federal or state law and, even if he could, he

5

cannot show any interference with such a relationship." CP at 181. Following briefing and argument, the trial court granted Kadlec's motion. Dr. Sambasivan again appeals.

ANALYSIS

Dr. Sambasivan's complaint alleges that Kadlec's actions "violated state and federal law prohibiting retaliation." CP at 6. In moving for summary judgment, Kadlec recognized that the doctor asserted a federal law retaliation claim under 42 U.S.C. § 1981 and a state law claim under Washington's Law Against Discrimination, chapter 49.60 RCW.

Kadlec persuaded the trial court that to assert a federal retaliation claim, Dr. Sambasivan must identify an impaired contractual relationship under which he has rights, that Dr. Sambasivan "relies on the [medical staff] Bylaws to provide the contractual nexus," and that the bylaws "cannot provide that nexus because (i) the Bylaws are not contractual and (ii) even if they were, Kadlec has not interfered with or impaired the Bylaws." CP at 188. It argued that to assert a state retaliation claim, Dr. Sambasivan must show that retaliatory action was "taken in the context of either an employment relationship or . . . an independent contractor relationship by which the plaintiff performed personal services for the defendant," that Dr. Sambasivan had neither relationship to Kadlec, and alternatively, that the board did not prevent the doctor from continuing to be a member of the medical staff. CP at 200-01.

6

In response, Dr. Sambasivan argued in the trial court that contrary to Kadlec's framing of his claims, he relies for his federal retaliation claim not on the medical staff bylaws, but on Kadlec's interference with his right to form contracts with patients and his contractual right or expectation of providing call coverage. He argued that the protection against retaliation provided by chapter 49.60 RCW applies more broadly than to employers, extending to those who contract with independent contractors and to any other person who discriminates against an individual who opposes a practice forbidden by chapter 49.60 RCW.

We review summary judgment decisions de novo, performing the same inquiry as the trial court. *Hisle v. Todd Pac. Shipyards Corp.*, 151 Wn.2d 853, 860, 93 P.3d 108 (2004) (citing *Kruse v. Hemp*, 121 Wn.2d 715, 722, 853 P.2d 1373 (1993)). Summary judgment will be upheld if the pleadings, affidavits, answers to interrogatories, admissions, and depositions establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300-01, 45 P.3d 1068 (2002); CR 56(c). We review all facts and reasonable inferences from the facts in a light most favorable to the nonmoving party. *Id.* at 300.

Given our decision in the prior appeal, our review proceeds from the premise that Dr. Sambasivan can demonstrate that the board's adoption and application of the proficiency standard was motivated by racial animus.

## I. *Law of the case*

Before arguing that he asserts viable retaliation claims, Dr. Sambasivan raises the "law of the case" doctrine as a threshold issue, arguing that the trial court should never have entertained a second summary judgment motion in light of this court's 2012 directive that it was "remand[ing] that claim for trial." 2012 WL 5208657, at *12. "'Where there has been a determination of the applicable law in a prior appeal, the law of the case doctrine ordinarily precludes redeciding the same legal issues in subsequent appeal.'" *State v. Worl*, 129 Wn.2d 416, 425, 918 P.2d 905 (1996) (quoting *Folsom v. County of Spokane*, 111 Wn.2d 256, 263, 759 P.2d 1196 (1988)). We may also refuse under the doctrine to address issues that could have been raised in a prior appeal. *State v. Elmore*, 154 Wn. App. 885, 896, 228 P.3d 760 (2010) (citing *Folsom*, 111 Wn.2d at 263-64). Kadlec could have asked us to affirm partial summary judgment on the issue of whether medical staff bylaws create a contractual relationship between the hospital and members of staff, but did not.[3] *See LaMon v. Butler*, 112 Wn.2d 193, 200-01, 770 P.2d 1027 (1989) (an appellate court may sustain a trial court's summary judgment upon any theory established by the pleadings and supported by the proof, even if the trial court did not

---

[3] Instead, Kadlec merely touched on that issue in a footnote, observing that "'[s]hould *this Court decide to reach the issue* of whether hospital medical staff bylaws create an enforceable contract, Kadlec maintains they do not.'" Br. of Resp't at 18 (emphasis added). It then provided a clerk's papers' citation to its briefing in the trial court.

consider it). Dr. Sambasivan asks us to follow cases that have applied the law of the case doctrine to refuse to consider questions that "might have been determined." *Miller v. Sisters of St. Francis*, 5 Wn.2d 204, 207, 105 P.2d 32 (1940) (citing *Perrault v. Emporium Dep't Store Co.*, 83 Wash. 578, 145 P. 438 (1915)), *overruled in part on other grounds by Pierce v. Yakima Valley Mem. Hosp. Ass'n*, 43 Wn.2d 162, 260 P.2d 765 (1953).

Most of the decisions relied upon by Dr. Sambasivan are distinguishable as involving an appellate court's refusal in a second appeal to revisit an issue that was squarely presented and decided in the first. *E.g., Baxter v. Ford Motor Co.*, 179 Wash. 123, 125, 35 P.2d 1090 (1934); *Columbia Steel Co. v. State*, 34 Wn.2d 700, 706, 209 P.2d 482 (1949). Other second appeals that he cites followed a first appeal from the result of a trial, making it reasonable to say, as to issues that could have been raised following the first trial but were not, that "[t]he law of the case[,] as applied to the same facts, shown by the same evidence, was thus settled for all time." *Perrault*, 83 Wash. at 582; *Miller*, 5 Wn.2d at 208. But here, the first appeal was from a summary judgment motion that was addressed to limited issues. The trial court resolved the motion on even more narrow grounds. We note that unlike CR 12(g), which requires the consolidation of certain motions to dismiss, CR 56 does not require a party to consolidate its grounds for summary judgment in a single motion.

In any event, the law of the case is a discretionary doctrine. *Folsom*, 111 Wn.2d at 263-64; *cf.* RAP 2.5(c)(1) (the appellate court "may" review and determine the propriety

9

of a trial court decision even though a similar decision was not reviewed in an earlier review of the same case). We need not decide whether or when the appeal of a dispositive motion presents a potential barrier to subsequent appeals. In this case, we will consider the issue on the merits.

## *II. Retaliation under 42 U.S.C. § 1981*

In its original form, 42 U.S.C. § 1981 was part of § 1 of the Civil Rights Act of 1866.[4] The purpose of the Reconstruction Era legislation was to grant civil rights to newly freed slaves. The United States Supreme Court has pointed out that "[t]hat section was cast in sweeping terms:"

> "*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That all persons born in the United States and not subject to any foreign power, . . . are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, . . . shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding."

*Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 422-23, 88 S. Ct. 2186, 20 L. Ed. 2d 1189

---

[4] Act of April 9, 1866, ch. 31, § 1, 14 Stat. 27, re-enacted by § 18 of the Force Act of 1870, Act of May 31, 1870, ch. 114, § 18, 16 Stat. 140, 144, and codified in §§ 1977 and 1978 of the Revised Statutes of 1873-74, now 42 U.S.C. §§ 1981 and 1982.

(1968) (alterations in original) (quoting § 1 of the 1866 act). It is well settled that the Civil Rights Act of 1866 prohibited private as well as public racial discrimination, and that the prohibition of private discrimination was within Congress' power under § 2 of the Thirteenth Amendment. *Runyon v. McCrary*, 427 U.S. 160, 170, 96 S. Ct. 2586, 49 L. Ed. 2d 415 (1976).

As presently codified, § 1981(a) provides in relevant part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State . . . to make and enforce contracts . . . as is enjoyed by white citizens." Section 1981 not only protects a plaintiff's right to respond to an existing offer of a contract, it also provides a remedy where a defendant's action prevents a plaintiff from obtaining contracts. As pointed out in *McCrary*, discussing the Court's earlier decision in *Jones*,

> Just as in *Jones* a Negro's § 1 right to purchase property on equal terms
> with whites was violated when a private person refused to sell to the
> prospective purchaser solely because he was a Negro, so also a Negro's § 1
> right to "make and enforce contracts" is violated if a private offeror refuses
> to extend to a Negro, solely because he is a Negro, the same opportunity to
> enter into contracts as he extends to white offerees.

427 U.S. at 170-71.

The meaning of "make and enforce contracts" for purposes of § 1981 was broadened by Congress by the Civil Rights Act of 1991, in response to a decision by the United States Supreme Court that construed § 1981 as having no application to "conduct which occurs after the formation of a contract and which does not interfere with the right

11

to enforce established contract obligations." *Patterson v. McLean Credit Union*, 491 U.S. 164, 171, 109 S. Ct. 2363, 105 L. Ed. 2d 132 (1989). Following the 1991 act, § 1981(b) broadly defines "make and enforce contracts" for purposes of the statute as including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). The statute encompasses claims based on retaliation as well as discrimination. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 128 S. Ct. 1951, 170 L. Ed. 2d 864 (2008). It requires proof of intentional discrimination; unlike actions under Title VII, proof of disparate impact is not enough. *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 389, 102 S. Ct. 3141, 73 L. Ed. 2d 835 (1982).

"Any claim brought under § 1981 . . . must initially identify an impaired 'contractual relationship,' § 1981(b), under which the plaintiff has rights." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476, 126 S. Ct. 1246, 163 L. Ed. 2d 1069 (2006). Kadlec's second motion for summary judgment contended that Dr. Sambasivan had failed to present evidence of any actionable impairment of a contract.

Kadlec devotes the first part of its briefing to arguing that medical staff bylaws do not create a contract with members of the medical staff. It relies on cases from other jurisdictions, since no reported Washington case has addressed the issue. It suggests that we may affirm the trial court on the basis of the issue, because Dr. Sambasivan makes no effort to argue otherwise.

12

But we would not expect Dr. Sambasivan to address the contractual or noncontractual character of the medical staff bylaws, since the bylaws are not the contract or opportunity that he claims was impaired. He argues instead that he was injured in his contractual rights and relations in two ways: he lost the capacity to contract to perform emergency department call coverage services for the hospital, and he lost the capacity to serve patients who would have come to him at Kadlec for interventional cardiology consultations and procedures. It is only those impaired rights that we need address on appeal.

Kadlec argues that these two rights or opportunities to contract are also insufficient to state a claim under § 1981.

### A. Opportunity to contract to provide call coverage

A doctor cannot practice medicine at Kadlec or use Kadlec's facilities and equipment without first having been granted privileges in that doctor's field of medicine. Kadlec medical staff appointments and conferrals of clinical privileges are for two-year periods. Physicians on active medical staff whose privileges are expiring must submit a reappointment application. Kadlec's bylaws provide that all medical staff appointments and privilege delineations are subject to final review and decision by the governing body of the hospital, which is Kadlec's board of directors. The bylaws provide that the granting of privileges by Kadlec is completely within the board's discretion.

13

Before 2004, cardiologists on staff at Kadlec took call without pay as a condition of having interventional cardiology privileges at the hospital. In 2004, a group of physicians successfully pressured Kadlec to pay some of its physicians for on-call time. On March 29, 2007, Kadlec entered into an Emergency Department Call Coverage Agreement for interventional cardiology with Dr. Sambasivan.[5] Under the contract, Dr. Sambasivan agreed to be available to provide services to the hospital's emergency department in accordance with a call schedule to be prepared by the chair of the Interventional Cardiology Department. In exchange, he would be paid $700 for each 24-hour day of coverage. He would also have the sole right to bill for his professional services furnished to patients under the agreement. The contract was to run from April 1, 2007 to March 31, 2008. The March 31, 2008 termination date was the day before Dr. Sambasivan's existing appointment was due to expire.

When Dr. Sambasivan's clinical privileges came up for renewal in the spring of 2008, he was granted temporary privileges until a recommendation and final decision could be made about his request for reappointment. Although his written call coverage agreement expired by its terms at the end of March 2008, the medical staff bylaws and agreements in the record support an inference for summary judgment purposes that the hospital's practice was to enter into emergency department call coverage contracts with

---

[5] Kadlec's failure to pay Dr. Sambasivan for call service he provided before the date of this contract was the basis of his restitution claim. 2012 WL 5208657, at *6-8.

every interventional cardiologist on the medical staff. Dr. Sambasivan's 2007 call contract provides that "[i]f Physician is a member of the active Medical Staff at the Medical Center, Physician acknowledges that Physician has an obligation to provide emergency call coverage in accordance with the Medical Center's Medical Staff Bylaws, unless granted an exemption or waiver of such obligation." CP at 425. The medical bylaws provide, "Each physician, regardless of his/her assigned staff category, or exercising of temporary privileges under Section 3.5, is expected to: . . . (f) participate in an emergency room on-call schedule and hospital consultation call schedule, if a member of the active physician staff." CP at 254.

When Dr. Sambasivan became ineligible for renewal of his interventional cardiology privileges after the Kadlec's board adopted the retroactively applied volume proficiency standard, he ceased to have the opportunity to accept call coverage contracts.

As observed by the United States Supreme Court in *Domino's Pizza*, 546 U.S. at 476, the impaired contractual relationship required to assert a § 1981 claim "need not already exist, because § 1981 protects the would-be contractor along with those who already have made contracts." *Domino's Pizza* makes clear that the Supreme Court has

> never retreated from what should be obvious from reading the text of the
> statute: Section 1981 offers relief when racial discrimination blocks the
> creation of a contractual relationship, as well as when racial discrimination
> impairs an existing contractual relationship, so long as the plaintiff has or
> would have rights under the existing or proposed contractual relationship.

15

*Id.* Dr. Sambasivan's evidence is sufficient to present a jury issue whether his opportunity to enter into future call coverage contracts was lost when Kadlec took its challenged action.

Kadlec argues, however, that the doctor's loss of the contracting opportunity was merely a "collateral consequence" of losing clinical privileges—and thereby an insufficient contractual opportunity to support a claim under § 1981. Resp't's Br. at 27. It relies upon three decisions: *Jimenez v. WellStar Health Systems*, 596 F.3d 1304 (11th Cir. 2010); *Williams v. Columbus Regional Healthcare Systems, Inc.*, 499 F. App'x 928 (11th Cir. 2012), *cert. denied*, 133 S. Ct. 2340 (2013), which is a per curiam decision based entirely on *Jimenez*; and an unreported decision from a district court in Missouri, *Adem v. Jefferson Memorial Hospital Association*, 2012 WL 5493856 (E.D. Mo. 2012), that likewise relies on *Jimenez*.

The plaintiff in *Jimenez*, a Black physician with a specialty in neurosurgery, sued WellStar Health Services after its medical care evaluation committee suspended his medical staff privileges. He asserted three impaired contractual rights: his "contractual relationship with WellStar," his right to contract with patients and third-party payors, and his property interest in his profession. *Jimenez*, 596 F.3d at 1309. The "contractual relationship with WellStar" that he relied upon was an alleged "implicit contract with WellStar, pursuant to which WellStar agreed to grant Jimenez medical staff privileges and, in turn, Jimenez agreed to treat patients at WellStar hospitals." *Id.* The Eleventh Circuit

16

Court of Appeals noted that WellStar's policies made clear that medical staff privileges do not confer contract rights, and that Georgia law was in accord. *Id.* It concluded that because the suspension of medical staff privileges did not directly implicate any contractual relationship, it could not be the basis of a § 1981 discrimination claim.

The court then turned to Dr. Jimenez's contention that the suspension of his medical privileges impaired his opportunity to contract with patients and third-party payors, a claim that is analogous to Dr. Sambasivan's claim that the Kadlec board's adoption and retroactive application of a proficiency standard impaired his future opportunity to contract for call coverage. *Jimenez* rejects the claim that Dr. Jimenez's opportunities were impaired, offering the following reasoning:

> Jimenez had access to the patients he treated at WellStar only because they were admitted to the hospital while he was on call; thus, his relationship with them was a benefit of the medical staff privileges to which he was no longer entitled. The same conclusion precludes any claim Jimenez makes regarding interference with future contracts he might have formed with patients admitted after his suspension; in addition, such contracts are too speculative to form the basis of a § 1981 claim. . . . [A]ny interference with Jimenez's relationships with WellStar's patients cannot provide the basis for his § 1981 claim. It is illogical that Georgia would grant WellStar the authority to suspend privileges to treat its patients while simultaneously obliging WellStar to allow Jimenez to contract with its patients for that treatment.

*Id.* at 1310.

*Jimenez*'s rationale that future patient and third-party payor contracts relied on by Dr. Jimenez were "too speculative" has no application to Dr. Sambasivan's reliance in

17

this case on future call coverage contracts. As already discussed, Dr. Sambasivan's evidence of Kadlec's bylaws and practice is sufficient to create a jury question as to whether he would have continued to be offered call coverage contracts had the board's action not rendered him ineligible for interventional cardiology privileges.

The remaining rationale of *Jimenez*, simply stated, appears to be this: if a defendant's intentionally discriminatory action against a plaintiff is not *itself* a breach of contract, then any other contract rights or opportunities that it impairs are not actionable under § 1981. This is wrong under both the plain language of § 1981 and clear precedent. *Jimenez* takes four facts, some bearing on contractual duty and others bearing on tortious discrimination, and treats the wrong ones as dispositive. Four facts that *Jimenez*, this case, and a number of other § 1981 cases have in common are that:

The defendant took an action that adversely affected the plaintiff,

The action was motivated by racial animus,

The plaintiff has no *contractual* basis for challenging the defendant's action, and

The defendant's action impaired the plaintiff's right and ability to enter into other contracts.

*Jimenez* treats the first and third facts—the defendant took an action adversely affecting the plaintiff that the plaintiff has no contractual basis for challenging—as dispositive of the § 1981 claim. But the third fact is irrelevant to a § 1981 claim. Section 1981

18

provides a remedy for intentional discrimination that produces contractual impairment whether or not the defendant breaches a contract in the process.

Historical examples are illustrative. *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 90 S. Ct. 400, 24 L. Ed. 2d 386 (1969) provides one example of *Jimenez*'s misapplication of § 1981. *Sullivan* arose under 42 U.S.C. § 1982, a codification of other protections included in the Civil Rights Act of 1866. The United States Supreme Court has "long construed §§ 1981 and 1982 similarly." *CBOCS*, 553 U.S. at 447, 446 (relying on *Sullivan* as presenting a "comparable question" because "similar to § 1981 except that it focused . . . [upon] rights related to the ownership of property"). Sullivan, the plaintiff, leased a home that he owned in Fairfax County, Virginia, to a Black family and at the same time attempted to assign to them his membership share in Little Hunting Park, Inc., a corporation that owned and operated a community park and playground facilities for the benefit of county residents. A membership share entitled members of a shareholder's family to use the recreation facilities. Under the corporation's bylaws, a person owning a membership share was entitled when renting his home to assign the share to his tenant, "subject to approval of the board of directors." *Sullivan*, 396 U.S. at 234.

The Little Hunting Park board refused to approve Sullivan's attempted assignment to his tenant, and, when he protested, expelled him, tendering him cash for his shares. The refusal to approve the assignment was within the board's power under the corporation's bylaws and the expulsion was likewise "backed by [the] state court

19

judgment." *Id.* at 237. Yet whatever validity the board's two actions had under the bylaws, its refusal to approve the assignment of the membership share was "clearly an interference with [the Black tenant's] right to 'lease,'" and the expulsion was punishment for trying to vindicate the rights of minorities protected by the statute. *Id.* Given the allegation of racial animus, both collateral impairments were actionable under § 1982.

A second example is the United States Supreme Court's decision in *Patterson*, in which it narrowly construed the meaning of "make and enforce contracts." The plaintiff in *Patterson*, a Black woman employed as a teller with the defendant credit union, alleged that on account of her race she was harassed during her employment, passed over for a promotion, and eventually laid off. She made no allegation that the credit union breached any *contract* right of hers in passing her over for promotion or laying her off. Although the Supreme Court's narrow construction of § 1981 caused it to conclude that her harassment- and layoff-based claims were properly dismissed (thereby leading to enactment of the Civil Rights Act of 1991), it held that her "failure to promote" claim did state a cause of action under § 1981—regardless of the fact that it was a collateral consequence of a layoff that she could not attack on contract grounds. "[T]he question whether a promotion claim is actionable under § 1981 depends," the Court said, "upon whether the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer. If so, then the employer's refusal to enter the new contract is actionable under § 1981." *Patterson*, 491 U.S. at 185.

20

By the *Jimenez* court's reasoning, it was "illogical" that the credit union had the right to lay off Ms. Patterson, while simultaneously being required to consider her for a promotion. But there is nothing illogical about it. *Jimenez* fails to recognize that individuals like Dr. Jimenez and Ms. Patterson can have contracts with parties who then intentionally inflict direct or indirect harm on them, based on racial animus—and the discrimination victim's contract provides no protection whatsoever from that discriminatory act or the resulting harm. Accordingly, an act that might be contractually permissible for a defendant is still actionable under § 1981 if discriminatory intent and the required harm can be proved.

These cases illustrate the proper application of § 1981 and other civil rights protections addressed by the 1866 act. Better-reasoned decisions recognize that a physician may assert a § 1981 claim where a denial of privileges or credentialing, based on race or national origin, impairs his or her contract rights or opportunities. In *Vakharia v. Swedish Covenant Hospital*, 765 F. Supp. 461, 471-72 (N.D. Ill. 1991), the court held that an anesthesiologist's claims that a hospital limited her to a limited number of procedures and removed her from call schedule "seem to fall easily within the rubric of proscribed conduct" under § 1981. In *Morrison v. American Board of Psychiatry & Neurology, Inc.*, 908 F. Supp. 582, 588-89 (N.D. Ill. 1996) the court refused to dismiss a § 1981 claim based on a denial of board certification in psychiatry that was alleged to interfere with the plaintiff's ability to contract.

21

## B. *Opportunity to contract with future patients*

The second contract right or opportunity that Dr. Sambasivan contends was impaired by Kadlec's adoption and retroactive application of the proficiency standard was his ability to serve patients who would have come to him at Kadlec for interventional cardiology consultations and procedures. In resisting summary judgment, he identified five patients who he had to direct to other interventional cardiologists.[6] Kadlec responds by arguing (1) that Dr. Sambasivan remained on the medical staff with privileges in general cardiology; (2) that he could perform interventional procedures at any hospital where he held interventional privileges, such as Deaconess Medical Center in Spokane; and (3) that even if Dr. Sambasivan enjoyed rights or opportunities for such contracts, the lost benefit of the contracts was a collateral consequence of the sort held by *Jimenez* not to be actionable under § 1981. Br. of Resp't at 29.

Addressing Kadlec's last argument first, we have already rejected *Jimenez*'s reasoning that no § 1981 claim lies against a defendant who acts with racial animus and thereby causes the impairment of a plaintiff's contract rights or opportunities, as long as the defendant's act was contractually permitted. We reject the argument here as well.

---

[6] Kadlec argues that in response to discovery Dr. Sambasivan asserted that lost patient relationships were not relevant and refused to produce documentation. Br. of Resp't at 29. It overlooks the fact that while the doctor initially objected on that basis and by citing patient confidentiality, he later answered the questions after losing his motion for a protective order.

22

Kadlec's argument that Dr. Sambasivan still enjoyed *general* cardiology privileges is nonresponsive to Dr. Sambasivan's contention that his ability to serve patients who would have come to him at Kadlec for *interventional* cardiology consultations and procedures was impaired. The doctor does not argue that he is entitled to recover for impairment of contracts to provide general cardiology services.

Finally, the argument that Dr. Sambasivan could have traveled 150 miles from his Tri-Cities-based practice to provide interventional cardiology services to patients in Spokane, or could have traveled elsewhere, ignores the plain language of § 1981 that "[a]ll persons within the jurisdiction of the United States shall have the *same right* . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a) (emphasis added). Arguing that a physician may practice his medical specialty at the hospitals that do not discriminate against him is not a defense to a § 1981 claim, for reasons that were explained by the United States Supreme Court in *Jones*. There, the Court pointed out that racially-based restrictive covenants at issue in its 1948 decision in *Hurd v. Hodge*, 334 U.S. 24, 68 S. Ct. 847, 92 L. Ed. 1187 (1948) had covered only two-thirds of the lots of a single city block, and that preventing Blacks from buying or renting homes in that specific area would not have rendered them ineligible to do so elsewhere in the city. "Thus," *Jones* explained,

> if § 1982 had been thought to do no more than grant Negro citizens the
> legal capacity to buy and rent property free of prohibitions that wholly
> disabled them because of the race, judicial enforcement of the restrictive

covenants at issue would not have violated § 1982. But this Court took a broader view of the statute. Although the covenants could have been enforced without denying the general right of Negroes to purchase or lease real estate, the enforcement of those covenants would nonetheless have denied the Negro purchasers "the same right 'as is enjoyed by white citizens . . . .'" [*Hurd,*] 334 U.S. at 34, 68 S. Ct. at 852, 92 L. Ed. at 1194. That result, this Court concluded, was prohibited by § 1982. To suggest otherwise, the Court said, "is to reject the plain meaning of language." *Ibid.*

*Jones,* 392 U.S. at 418-19.

Dr. Sambasivan's evidence presented a jury question of impairment supporting a § 1981 claim. It was error for the trial court to grant summary judgment dismissing it.

### III. Retaliation under RCW 49.60.210(1)

RCW 49.60.210(1) provides:

It is an unfair practice for any employer, employment agency, labor union, or other person to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter, or because he or she has filed a charge, testified, or assisted in any proceeding under this chapter.

To maintain a retaliation claim under the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, a plaintiff must establish that (1) he participated in a statutorily protected activity, (2) an adverse employment action was taken against him, and (3) his activity and employer's adverse action were causally connected. *Hollenback v. Shriners Hosps. For Children,* 149 Wn. App. 810, 821, 206 P.3d 337 (2009). The plaintiff need not show that retaliation was the only or "but for" cause of the adverse

24

employment action, but he or she must establish that it was at least a substantial factor. *Allison v. Housing Auth. of City of Seattle*, 118 Wn.2d 79, 85-96, 821 P.2d 34 (1991).

In its second summary judgment motion, Kadlec argued that for purposes of his state law claim, Dr. Sambasivan was required to demonstrate that Kadlec was his employer, or, citing *Marquis v. City of Spokane*, 130 Wn.2d 97, 112-13, 922 P.2d 43 (1996), that he was in an independent contractor relationship by which he performed personal services for Kadlec.

By its terms, RCW 49.60.210(1) broadly states that it is an unfair practice "for *any* . . . *person* to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter." (Emphasis added.) Two published Washington decisions have read the retaliation provision more broadly than the construction urged by Kadlec.

In 1997, the provision was held to apply to a former member of a credit union who was expelled as a member by the credit union's board after he provided a declaration supporting an age- and gender-based discrimination lawsuit brought by credit union employees. *Galbraith v. TAPCO Credit Union*, 88 Wn. App. 939, 946 P.2d 1242 (1997). While recognizing that Washington cases interpreting the statute had generally involved employee claims against employers, the *Galbraith* court identified several reasons for construing it more broadly: first, RCW 49.60.210's broad language that an unfair practice committed by "any . . . person" was actionable; second, the fact that chapter 49.60 RCW

25

"covers many situations other than employment, such as credit, travel, insurance, real estate transactions, etc." and that "[n]othing in its title or content limits the WLAD to labor or employer-employee relations," *id.* at 950; and third, that a limited construction "would be contrary to the Legislature's mandate to construe the WLAD liberally." *Id.* at 949 (citing RCW 49.60.020). It also pointed out that Galbraith's actions had been "labor-related, albeit derivative." *Id.* at 951.

A year later, the retaliation remedy was held to be unavailable to a plaintiff attempting to sue a co-worker in *Malo v. Alaska Trawl Fisheries, Inc.*, 92 Wn. App. 927, 930, 965 P.2d 1124 (1998), but the court still read the statute more broadly than Kadlec would have us read it. Reading the statute as a whole and applying the ejusdem generis rule, the *Malo* court refused to construe it as providing a remedy against any person whatsoever, but held that it was directed not only at employers but also

> at entities functionally similar to employers who discriminate by engaging in conduct similar to discharging or expelling a person who has opposed practices forbidden by RCW 49.60.

92 Wn. App. at 930.

Here, Kadlec's Emergency Department Call Coverage Agreement had provided at its article V that in performing services under the agreement, Dr. Sambasivan was acting as an independent contractor, a relationship that was held in *Marquis* to be subject to the protections of chapter 49.60 RCW. And under either *Galbraith*'s or *Malo*'s construction of RCW 49.60.210(1), Kadlec's denial of privileges, which directly affects the ability of

26

physicians to carry on their profession within the hospital, is sufficiently equivalent, or derivative of a labor-related activity, to be actionable under the statute.

For the foregoing reasons, Dr. Sambasivan demonstrated that both his federal and state law claims present genuine issues of fact, requiring trial. It was error to enter summary judgment.

### IV. Attorney fees

Dr. Sambasivan requests attorney fees under RAP 18.1 and in accordance with the governing federal and state civil rights statutes, 42 U.S.C. § 1988 and RCW 49.60.030(2). Kadlec correctly contends that Dr. Sambasivan's request is premature, since the case has not yet been tried on the merits. *Dowler v. Clover Park Sch. Dist. No. 400*, 172 Wn.2d 471, 485, 258 P.3d 676 (2011) (award of fees under RCW 49.60.030(2) must await outcome of trial on the merits); *Hewitt v. Helms*, 482 U.S. 755, 759, 107 S. Ct. 2672, 96 L. Ed. 2d 654 (1987) (eligibility for attorney fees under § 1988 requires that plaintiff receive at least some relief on the merits of his claim before he can be said to prevail).

Reversed and remanded for trial.

_____
Siddoway, C.J.

WE CONCUR:

_____
Korsmo, J.

_____
Fearing, J.

27